**Daniel GLOSBAND, Trustee in Bankruptcy of D. C. Sullivan & Co., Inc., Plaintiff,**

v.

**WATTS DETECTIVE AGENCY, INC., et al., Defendants.**

**Civ. A. No. 70–1336–N.**

United States District Court, D. Massachusetts.

Aug. 28, 1981.

---

Daniel Featherston, Jr., and Benjamin Goldman, Boston, Mass., for plaintiff.

Timothy H. Gailey, Hale & Dorr, Boston, Mass., for defendant Watts Detective Agency.

James F. Freeley, Feeney & Freeley, Boston, Mass., for defendant Daniel Sullivan.

Benjamin Brown, Boston, Mass., for defendant William Otte.

## ORDER AND MEMORANDUM OF DECISION

DAVID S. NELSON, District Judge.

The trustee in Bankruptcy of D. C. Sullivan & Co., Inc., ("Sullivan Company") brought this action to recover the value of certain of the bankrupt's assets that were allegedly misappropriated. Named as defendants were Watts Detective Agency ("Watts"), the alleged recipient of the bankrupt's assets; Consolidated Service Corporation ("Consolidated"), Watts' parent corporation; Christopher P. Recklitis ("Recklitis"), the President of both Watts and Consolidated; and David C. Sullivan ("Sullivan") and Billy R. Otte ("Otte"), the bankrupt's President and Vice-President. The trustee proceeded against these defendants under the following three theories of liability alleged in the complaint under separate counts. First, that not more than one year prior to Sullivan Company's bankruptcy, and while Sullivan Company was insolvent or so as to render it insolvent, they caused certain of its assets to be transferred to Watts for less than fair consideration, in violation of former 11 U.S.C. § 107(d)(2)(a).[1] Second, that they caused such transfer to be made not more than one year prior to Sullivan Company's bankruptcy with the actual intent to hinder, delay, or defraud either existing or future creditors in violation of former 11 U.S.C. § 107(d)(2)(d). Third, that they unlawfully caused the bankrupt's assets to be diverted to Watts in violation of their fiduciary duty to Sullivan Company.

The evidence introduced in the case purported to show the following facts. Before the time of the alleged transfer of much of its property to the defendants, Sullivan Company had come upon financially hard times. Since 1968, it had owed the Internal Revenue Service unpaid payroll and with-

---

1. This action was commenced prior to the comprehensive reform of the bankruptcy code wrought by P.L. 95–598, 92 Stat. 2549, on November 6, 1978. Accordingly, it is governed by the provisions of the former Title 11, see P.L. 95–598 § 403(a), and all citations in this opinion are to that former title.

holding taxes amounting by April 1, 1970 to over $210,000. (Admitted fact 25; Exhibit 15). Further, it owed taxes to the Commonwealth of Massachusetts for the period 1961 to 1970 in the amount of $57,893. (Admitted fact 27). In 1969 and 1970, its disbursements continually exceeded sales by nearly 50%. (Admitted facts 19, 20, 22 and 23).

In May 1969, Recklitis and Otte engaged in preliminary discussions about a possible sale of Sullivan Company, but nothing resulted from the discussions. (Admitted fact 40).

In early 1970, Otte again discussed a possible sale of Sullivan Company with Recklitis. (Admitted fact 41). By that time Recklitis had become president of Watts as well as Consolidated. (Admitted fact 9).

In early April, Recklitis made an offer for the operating part of the Sullivan Company amounting to approximately $250,000. Sometime thereafter, Otte telephoned the customers of Sullivan Company to inform them that Sullivan Company was contemplating a sale of its business and to learn whether they would transfer their patronage to the purchaser. The customers apparently indicated that they would stay with the new company so long as service was uninterrupted.

Sullivan rejected Recklitis' offer of $250,000 as being too low. Subsequently, the IRS indicated that it would levy on Sullivan Company's accounts receivable. On April 20, 1970, Sullivan Company had accounts receivable of $37,997.52. (Admitted fact 32). This money was needed principally to pay employee salesmen. At that time, Sullivan Company had a weekly payroll of $15,772.21 (Admitted fact 30) and a negative balance in its check book of $44,735.98. (Admitted fact 34). On April 22, 1970, Sullivan was in dire need of obtaining cash to meet that week's payroll as well as to cover the payroll checks sent out for the previous week. Apparently aware of Sullivan's worsening financial condition, Recklitis made a second, lower offer which was contingent on IRS' approval.

Negotiations between Watts, Sullivan Company and the IRS followed. At a meeting at 5:00 PM on April 22, 1970, the IRS rejected the last of the proposals made and stated to those present—Otte, Sullivan and Recklitis—that it would levy on Sullivan Company's accounts receivable the next day. After the meeting, Sullivan indicated that he was walking away from the business and that Otte should do whatever he had to do. Recklitis then offered Otte employment with Watts, and Otte accepted.

That evening and the next day, Otte began contacting the employees and customers of Sullivan in order to arrange for uninterrupted guard service. In this way, Watts, through Otte, sought to take over what were—according to the plaintiff trustee—the major assets of the Sullivan Company starting at 8:00 AM on the day the IRS was due to levy on Sullivan Company's accounts. On April 23, Watts began to service nine of Sullivan Company's former customers. (Admitted fact 55). Within a few days, Otte had secured for Watts thirteen of Sullivan Company's seventeen customers and enough of its employees to provide uninterrupted service for these clients. For at least one or two weeks following April 22, Watts supervised the servicing of Sullivan Company's former customers using the Sullivan Company offices. That year, ending April 22, 1971, some $680,562 of Watts' gross sales were attributable to Sullivan Company's former customers. (Admitted fact 57).

The jury found all five defendants liable under Count I, and found defendants Sullivan and Otte alone liable under Count III; it further found that the bankrupt had sustained damages in the amount of $750,000. The verdict on Count II was in favor of the defendants. Pursuant to the jury's verdict, judgment was entered.

Currently pending before this court are various post-verdict motions urged on behalf of the several defendants. Defendants Watts, Consolidated and Recklitis, found liable only under Count I, have moved pursuant to F.R.Civ.P. 50(b) for judgment notwithstanding the verdict and in the alterna-

tive have moved pursuant to Rule 59(a) for a new trial, or a new trial on the issue of damages alone, or a remittitur. Defendants Otte and Sullivan, found liable under both Counts I and III, have also each moved for judgment notwithstanding the verdict and in the alternative for a new trial.

The motions for judgment notwithstanding the verdict shall be treated first, followed by the motions for new trial. Within each section the arguments of the various defendants shall be addressed *seriatim.*

## I. MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT

Defendants Watts, Consolidated and Recklitis advance three basic arguments in support of their motions for judgment notwithstanding the verdict. First, they argue that no "property" of the bankrupt, as that term is used in the Bankruptcy Act in connection with the definition of "transfer," old 11 U.S.C. § 1(30), passed from the bankrupt to any of the defendants. Second, they argue that there was no "transfer" within the meaning of the Bankruptcy Act because there was no proof that the bankrupt's estate was diminished. And, third, they argue that as a matter of law proof of the amount of damages was insufficient. Defendant Otte essentially adopts the arguments of Watts, Consolidated and Recklitis. Finally, defendant Sullivan adopts the arguments of the others but argues in addition that there was insufficient evidence to hold him liable under Count III, and that the verdict against him (and Otte) on Count III is inconsistent with the verdict for defendants Watts, Consolidated and Recklitis on that count.

As an initial matter we must set forth the proper standard for ruling on a motion for judgment notwithstanding the verdict. That standard holds that the motion shall be granted only when, without weighing the credibility of any of the evidence, the only conclusion that can reasonably be drawn from the evidence, including all reasonable inferences, is a verdict and judgment in favor of the moving party. Moore's Fed.Pract. ¶ 50.07[2]; *see Rios v.*

*Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 989–90 (1st Cir. 1978) (standard for appellate review of district court's denial of motion). Another attribute of the motion for judgment notwithstanding the verdict is that it has as a prerequisite a motion for a directed verdict. *Martinez Moll v. Levitt & Sons of Puerto Rico,* 583 F.2d 565, 568 (1st Cir. 1978); *see* F.R.Civ.P. 50(b) ("[A] party who has moved for a directed verdict may move to have the verdict and any judgment entered therein set aside and to have judgment entered in accordance with his motion for a directed verdict"). The purpose of this prerequisite "is to alert the opposing party to the movant's claim of insufficiency before the case goes to the jury, so that his opponent may have an opportunity to cure any deficiency in his case should the motion have merit." *Martinez Moll,* 583 F.2d at 569. As a corollary to the rule requiring a motion for a directed verdict as a prerequisite to a motion for judgment notwithstanding the verdict, any ground not raised in a motion for a directed verdict may not be raised in a later motion for judgment notwithstanding the verdict. *Sulmeyer v. Coca Cola Company,* 515 F.2d 835, 846 (5th Cir. 1975); *See* F.R.Civ.P. 50(a). Thus, the defendants' argument that the evidence was insufficient to prove the amount of damages fails, as it was not set forth at trial in any of the parties' motions for a directed verdict. The closest that the defendants came to raising that was the statement in support of their motion for a directed verdict by defendants Watts, Consolidated and Recklitis: "[D]efendants assert that plaintiff has introduced no evidence that . . . any property asserted to have been . . . transferred decreased the value of the Sullivan Company's assets." That argument appears to duplicate defendants' second main argument, to be considered *infra.* But it hardly amounts to fair notice of an objection that there was insufficient evidence of damages in any reasonably certain amount. Furthermore, in light of the holding in Part II below that the amount of damages found by the jury was not against the clear weight of the

evidence, it, *a fortiori,* may not be disturbed by the granting of a motion for judgment notwithstanding the verdict that it was against the only reasonable conclusion that could be drawn from the evidence.[2]

Having thus disposed of the third of the arguments of defendants Watts, Consolidated and Recklitis, we may now turn to their first two arguments. The primary claim of these defendants, which is also urged by defendants Otte and Sullivan, is that there was insufficient or indeed no evidence that "property" of the Sullivan Company, as that term is intended in the Bankruptcy Act, passed from the bankrupt to any of the defendants. In order properly to evaluate this argument, it is necessary to arrive at an understanding of the meaning of the word "property" in this context.

All defendants were found liable under Count I of the complaint, which rested on old 11 U.S.C. § 107(d)(2)(a): "Every transfer made ... by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer ..., if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent." A "transfer" is defined under old Title 11 as including "the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof ..., absolutely or conditionally, voluntarily or involuntarily, ... as a conveyance, sale, assignment, ... gift, ... or otherwise." Repealed 11 U.S.C. § 1(30). And "property" has been held to mean "something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process." *In re Portland*

*Newspaper Publishing Co.,* 271 F.Supp. 395, 398 (D.Or.1967), *quoting Gleason v. Thaw,* 236 U.S. 558, 561, 35 S.Ct. 287, 288, 59 L.Ed. 717 (1915). It has also been decided, perhaps a bit more broadly, as "anything of value—anything which has debt paying or debt securing power." *Pirie v. Chicago Title & Trust Co.,* 182 U.S. 438, 443, 21 S.Ct. 906, 908, 45 L.Ed. 1171 (1901). The difficulty of formulating a comprehensive yet meaningful definition of property was acknowledged by the Supreme Court in *Gleason:* "The accurate delimitation of the concept property would afford a theme especially apposite for amplificative philosophic disquisition." 236 U.S. at 560, 35 S.Ct. at 288. The Court went on to observe that the Bankruptcy Act is a pragmatic statute and its terms ought ordinarily to be accorded the benefit of a pragmatic reading. *Id.* More recently the court has again emphasized the importance which must be ascribed to the purposes of the Bankruptcy Act in interpreting the terms, including "property," which it employs. *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 514, 15 L.Ed.2d 428 (1966). The Court in that case dealt with § 70a(5) of the Bankruptcy Act, former 11 U.S.C. § 110(a)(5), which provided for the vesting in the trustee as of the date of the petition in bankruptcy of the title of the bankrupt to "property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered ...." It said, "[t]he main thrust of § 70a(5) is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed. [ci-

---

**2.** Holding the defendants barred from raising the issue of insufficiency of proof of damages due to their failure specifically to raise that issue on directed verdict is hardly unfair in this particular case, given the caution of this court on the record at the time of the motion for directed verdict that "I think that the parties have to be careful that they have complied with Rule 50–A insofar as it requires that the motion be accompanied by the grounds upon which a directed verdict is requested." Transcript, March 17, 1980, at 5–27.

tations omitted]" *Id.* The Court in *Segal* also recognized a sometimes limiting purpose of the Bankruptcy Act, "to leave the bankrupt free after the date of his petition to accumulate new wealth in the future," *Id.*, but that purpose is not relevant to the matter now at issue.

■ Therefore, adopting the general *Segal* approach of looking to statutory purpose, it is this court's holding that the term "property," as invoked in the definition of a "transfer" in the context of former 11 U.S.C. § 107(d)(2)(a)'s proscription of fraudulent transfers, should be interpreted "most generously" to incorporate anything of value which but for the transfer might have been preserved for the trustee to the ultimate benefit of the bankrupt's creditors. It should be noted that under this approach the issue of whether or not something is property "is necessarily a federal question, since it arises under a federal statute intended to have uniform application throughout the United States." *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370, 65 S.Ct. 405, 408, 89 L.Ed. 305 (1945) (meaning of "transfer" under the Bankruptcy Act). Of course the amount of protection to which some item of putative "property" is entitled under the law is generally a matter for state law—at least assuming state law is reasonable and not formulated simply so as to subvert the requirements of federal law, *Cf. DeSylva v. Ballentine*, 351 U.S. 570, 580–81, 76 S.Ct. 974, 979–80, 100 L.Ed. 1415 (1956)—but the question of whether the totality of that protection amounts to "property" under the Bankruptcy Act is, as just stated, an issue of federal law. That is, while state law will be permitted to determine the legal incidents of ownership or possession of a thing, the state law characterization of whether those incidents create a "property" right is not controlling so far as a federal court is concerned. With these general considerations in mind, therefore, it is necessary to turn more specifically to the issue of which, if any, of the things allegedly transferred in the case are considered "property" under the Bankruptcy Act.

■ Certain items are fairly easy to deal with. Ownership or possessory interests in office space would clearly constitute property, whether in the form of fee simple ownership, a tenancy for years, or even a tenancy at will. The court in *Lesser v. Mendelson*, 352 F.Supp. 321, 327 (S.D.N.Y.1971) aid, "Under the circumstances of the existing case, a month-to-month tenancy is a valuable right of the bankrupt, since a month-to-month tenant has every reason to believe that if he continues to pay his rent and if there is no great demand for the space by others, his month-to-month occupancy will continue without interruption for a substantial or indefinite period." This expectancy of continued occupation would appear to arise in even the barest tenancy at will or at sufferance, absent contravening indicia such as a stormy landlord-tenant relationship and the presence of other willing and financially able prospective tenants, and would constitute something of value which ought to be preserved to the trustee in bankruptcy. Similarly, ownership or leasehold interests in office furnishings and equipment would constitute "property" of the bankrupt. The evidence in the case at hand would have supported a jury finding that the possession of the Sullivan Company's office space and equipment was transferred, over a period of at least several days and perhaps as long as several weeks, to defendant Watts as of April 23, 1970. Since a "transfer" under old 11 U.S.C. § 1(30) includes the disposition of or parting with "property or an interest therein *or with the possession thereof*" [emphasis added], and an interest in office space and equipment is "property," the jury would have been justified in finding a transfer of property at least to this extent.

■ Turning next to the issue of the employees of the Sullivan Company, the analysis is not dissimilar. Considered individually, it may be that employees are not "property." It is probably the case that the Sullivan Company could not have enjoined competing concerns from hiring one of its at-will employees or enjoined such an employee from leaving. *See Barry v. Wash-*

*burn-Garfield Co.*, 358 Mass. 810, 265 N.E.2d 378 (1970) (rescript opinion). The mere fact that state law refuses to enjoin the disturbance of a relationship does not, of course, mean that the continuance of that relationship is not a property right. The court in *Lesser*, for instance, considered as having value a month-to-month tenancy even though its termination would by definition not have been enjoinable. It is possible that the expectancy of a continued employer-employee relationship, just as the prospect of a continued landlord-tenant relationship, is something of value which ought to be preserved for the benefit of the trustee. On the other hand, it may be that there is something unique about the freedom of individual employees to work where they choose so that even giving weight to the purposes of the Bankruptcy Act, *Segal, supra*, the expectation of the continuation of a single at-will employer-employee relationship may not be considered "property." But this issue need not be faced, as the jury in the instant case could clearly have found that not one but most of the Sullivan Company employees were transferred, in effect, to defendant Watts as of April 23, 1970. Certainly the aggregate of a business' employees, even if they be individually not property, is "property" within the meaning of the Bankruptcy Act. The jury could reasonably have found an expectancy that at least some of the employees would stay on for some indefinite period. There was testimony, for instance, that most of the Sullivan Company's guards had been with it for years. The jury could also have found from the testimony that some effort had gone into the selection and training of those employees, and most particularly that some of the guards would have been highly sought after because of their security clearances and familiarity with the job requirements of the customers over whose premises they had watched. Taking all of this into consideration, therefore, the jury could reasonably have found that some value could have been realized by the bankrupt, or by its successor the trustee, for the aggregate list of the employees of the Sullivan Company. Thus the roster of Sullivan employees, if not those employees taken as individuals, could be found to constitute "property" within the meaning of the Bankruptcy Act.

Turning next to the customers of the Sullivan Company, much the same may be said, although here more conventional case law is of some assistance. Again, it is usually stated that an injunction will not lie for solicitation of individual customers of an enterprise by a competing enterprise where those customers are not under some contractual obligation to remain with the enterprise being "raided." *Cf. American Republic Ins. Co. v. Union Fidelity L. Ins. Co.*, 470 F.2d 820, 825 (9th Cir. 1972). Again, this proposition may be less than useful, or at least less than controlling, on the question of whether an individual business-customer relationship and its expectancy of continuation rise to the level of "property" within the present context. But there are cases which hold, even for purposes of enjoining competitors, that customer *lists* are property. Since the only test in the present context is whether a customer list is practically speaking something of value to the trustee, and there are no concerns about freedom of competition to be counterbalanced, evidence which amounts to a showing of protected "property" under so-called "customer list" cases would *a fortiori* rise to that level under the Bankruptcy Act.

The customer list cases deal generally with the issue of whether absent specific contractual provisions a former employer may be enjoined from soliciting customers from the roster of customers of his former employer. In most cases, customer list cases form a particular element of the general field of trade secret or confidential information law. "[A]lthough an employee may carry away and use general skill and knowledge acquired during the course of his employment, he may be enjoined from using or disclosing confidential information so acquired. [citations omitted]" *New England Overall Co. v. Woltmann*, 343 Mass. 69, 75, 176 N.E.2d 193 (1961). "An examination of the authorities leads to the conclusion that no general and invariable rule can

be laid down where an employee, after leaving his employment, has made use of the information obtained by him through lists furnished by his employer, and that the question turns upon whether in a given case the list was confidential, and, if so, whether that fact should be submerged in the interests of free competition." *Woolley's Laundry, Inc. v. Silva*, 304 Mass. 383, 389, 23 N.E.2d 899 (1939). In some cases, customer lists, even if not confidential, may be protectable property under the customer list cases if they are reduced to writing, as opposed merely to existing in memory:

> The significance of the possession by an employee of a written list of his former employer's customers, as distinguished from the retention of their names in memory, in any particular case, where the information is not confidential, lies in the fact that the employer is the owner of the written paper, though partly or wholly prepared by the employee, in the fact that the list of customers was copied or written out in violation of a duty to the employee, or, perhaps, in the fact that the employer, in carrying off the written list, is carrying off something more than experience gained by him in the business.

*DiAngeles v. Scauzillo*, 287 Mass. 291, 297–98, 191 N.E. 426 (1934). The *DiAngeles* court seemed to treat the employer as the "owner of the written paper" if it was furnished by the employer, was a part of his system of accounts, was kept by the employee at the express or implied direction of the employer, or was essential to the business. *Id.* at 298, 191 N.E. 426. A list would be considered to be "copied or written out in violation of a duty to the employer" where it was written "in violation of any express or implied instruction of the [employer], surreptitiously, or for any disloyal purpose, such as preparing for further competition with him." *Id.* And a list might be "something more than experience gained by [the employee] in the business" where it "could [not] have been successfully carried in memory." *Id.* Finally, in determining

whether a customer list or other business information, whether or not in written form, is confidential,

> the Restatement of Torts, § 757, comment b, sets out six factors of relevant inquiry: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840, 282 N.E.2d 921 (1972). The *Jet Spray* court emphasized in particular the importance of the third factor, i.e., that the employer "not fail to take all proper and reasonable steps to keep it secret." *Id.* at 843, 282 N.E.2d 921. Often this would entail "periodic warnings and constant admonitions of secrecy." *Id.* at 844, 282 N.E.2d 921. But *Jet Spray* itself found a certain report confidential where only one copy was kept and it was given personally to one of the defendants to read, those facts constituting "sufficient and appropriate precautions to keep the report secret."

■ In the present case the jury could reasonably have found the existence of confidential or otherwise protected business information which was transferred to defendant Watts on or about April 23, 1970. The jury could have found that the list of customers of the bankrupt had been acquired over some period of time and with some effort,[3] and that such a list was of great value to the bankrupt and would be to potential competitors. The jury could have found the value of the list enhanced beyond that of an ordinary customer list because of the peculiar importance of continuity of

---

3. There was testimony that most of the company's customers had been with it for several years.

service in the security guard business. The jury could have found that knowledge of the entire customer list was confined to defendant Otte and his assistant James Margotta—who together managed the daily operations of the company—even though individual guard employees were of course familiar with the identity of customers whom they personally served. The jury could have found that while it would be relatively easy for competitors to observe a particular business and to ascertain whether it was among the bankrupt's customers, some significant difficulty would have arisen in duplicating the bankrupt's entire customer list, as that would have involved surveying all businesses in the area which would potentially be in need of security guards and ascertaining whether or not their needs were being serviced by the bankrupt. Under this combination of findings, the customer list would qualify as confidential under the Restatement as cited in *Jet Spray*. In addition, the customer lists could reasonably be found to be protected even if not confidential as a list reduced to written form under the *DiAngeles* rationale. That is, the jury could reasonably have found the customer list to be on paper owned by the Sullivan Company in that the paper was provided by the bankrupt and was kept at its direction. The jury could have found that the actual paper containing the list was appropriated or used by defendants Watts and Otte and others for a period of at least several days and perhaps several weeks after April 23. Additionally, the jury could have found the list to have been appropriated in violation of defendant Otte's duty to his employer, as it was being employed to the benefit of a competitor—defendant Watts—at a time when the Sullivan Company had not voluntarily filed a petition in bankruptcy or indicated in any way that it was terminating its business operations. *See infra.*

Thus the jury could reasonably have found the customer list transferred to defendant Watts on April 23 to have been "property" within the conventional definition of the customer list cases. As indicated earlier, this would seem *a fortiori* to

make it "property" within the contemplation of the Bankruptcy Act, where the overriding policy involved is to preserve anything of real value to the trustee in bankruptcy. Under this broader definition of property, most customer lists would qualify as having at least some value. What the *Woolley's Laundry* court said about a list of laundry delivery customers appears equally applicable to a list of security guard customers:

> The value of a list depends in great measure upon the good opinion of the goods that the employer may sell or the work that he may do for his customers. It is undoubtedly true that a delivery route for certain commodities has a certain sales value. This is usually so because some one can be found who is willing to pay something for the opportunity of serving the customers in the hope that he may continue to hold their patronage.

304 Mass. at 390, 23 N.E.2d 899. Thus the jury could reasonably have found that there was some value, and indeed substantial value, to the Sullivan Company customer list, for much the same reasons that it could have found the list to be confidential. Furthermore, there was testimony that many customers had had continued good relations with the bankrupt, a factor that would enhance the value of the list. Under both the somewhat restricted customer list cases and the broader compass of the definition of "property" fashioned earlier in this opinion, the jury could reasonably have found the Sullivan Company lists transferred to defendant Watts to have been property.

Under a similar analysis, other business information, all of it in written form, could have been found by the jury to amount to "property" under the Bankruptcy Act and to have been transferred to defendants. Thus there was testimony that schedules showing the times at which individual guards were to report to individual customers, the telephone numbers and addresses of guard and supervisory employees, as well as a detailed manual setting forth the needs and requirements of each of Sullivan Company's customers were also appro-

priated to the use of defendant Watts on April 23, 1970 for a period of at least several days or weeks. Such information could reasonably be found to be confidential and thus a trade secret, or at least in written form on paper owned by the bankrupt or appropriated in violation of a duty to it and thus qualifying as property by analogy to the written customer list cases. Furthermore, all of this information could quite reasonably be found something of value which the bankrupt or its successor the trustee could have sold. Under either approach, the information would qualify as Bankruptcy Act "property."

Finally, it remains to consider the least tangible alleged asset of the Sullivan Company which the trustee argues was "property" transferred to the defendants—goodwill. Goodwill at one time was thought of as "nothing more than the probability, that the old customers will resort to the old place." *Cruttwell v. Lye,* 17 Ves. 335, 346, *cited in Griffith v. Kirley,* 189 Mass. 522, 527, 76 N.E. 201 (1905). "[I]f it be assumed that a firm has been in existence for a time long enough to establish a business sufficiently permanent in character to include not only its customers but the incidents of locality and a distinctive name, these advantages constitute a going business enterprise; and it may then be said that the name and what is done under it go together; and a good will exists which forms an asset of commercial value ...." *Moore v. Rawson,* 185 Mass. 264, 273, 70 N.E. 64 (1904). Beyond name and location, goodwill is now taken to mean "all that goes with a business in excess of its mere capital and physical value, such as reputation for promptness, fidelity, integrity, politeness, business sagacity and commercial skill in the conduct of its affairs, solicitude for the welfare of customers and other intangible elements which contribute to successful commercial adventure." *Martin v. Jablonski,* 253 Mass. 451, 457, 149 N.E. 156 (1925). Goodwill "is a right of property which the courts will guard as carefully as it would visible, tangible property." *George G. Fox Co. v. Glynn,* 191 Mass. 344, 349, 78 N.E. 89 (1906). Further, "[a] corporation may have a valuable good will even though the business may have been conducted at a loss during certain years, [citation omitted], and the existence of good will is not negatived by an omission to carry it upon the books at a certain valuation. [citation omitted]" *Commissioner of Corporations & Taxation v. Ford Motor Co.,* 308 Mass. 558, 571, 33 N.E.2d 318 (1941). As stated earlier, the state court characterization of goodwill as "property" is not binding under the Bankruptcy Act, but as goodwill is by definition *something of value* in a going concern which attaches by reason of its name, location, skill, reputation and the like clearly is "property" for the purposes of this opinion.

Analytically distinct from the concept of goodwill yet somewhat related is what has been termed "going concern value." "An additional element of value attaches to property, considered in the aggregate, by reason of its having been assembled for the conduct of a given business and its fitness for such use." *In re Nathanson Bros. Co.,* 64 F.2d 912, 913 (6th Cir. 1933). In other words, because the resources of an ongoing enterprise are used in conjunction with each other they may well have a collective value, as so used, in excess of the sum of the values of the individual resources taken separately.

Both goodwill and the *Nathanson Bros.* "going concern value" are going concern values in the sense that each arises initially only in conjunction with a going concern. When an enterprise ceases to be a going concern, goodwill evaporates, gradually if not instantly. Of course it may re-arise in the hands of a successor business, but that is dependent upon its performance, and would constitute the goodwill of *that* enterprise. So far as the original enterprise is concerned, and so far as the bankrupt in the instant case is concerned, the existence and value of goodwill depend upon the enterprise's status as a going concern.

"Going concern value," as that term was used in *Nathanson Bros.,* is somewhat different. Though it initially arises, like good-

will, out of the arrangement of resources in a going concern, upon the death of that going concern the value would remain in the aggregate assets so long as those assets can be transferred together to a willing individual or entity which contemplates utilizing them together.

There are other differences between goodwill and "going concern value" as defined above. The latter concept has a kind of internal focus, as it is the added increment of value which attaches to a business by virtue of the way in which its individual assets and components are arranged and utilized in conjunction with each other. The concept of goodwill, on the other hand, has a more external focus, as it is derived from the attitude of customers and potential customers by virtue of the history of past performances by a company. These two notions are related, of course. Thus a business may be inefficiently arranged internally so as to reflect only a small *Nathanson Bros.* increment and this may result as well in poor performance so far as customers are concerned, giving rise as a result to a small goodwill value. And, as stated earlier, both concepts describe essentially intangible assets which are capable of existing only as part of a going concern. In any event, both types of intangible, as items of value from which the trustee and hence creditors could realize a benefit, as "property" under the Bankruptcy Act.

■ Before determining whether or not the jury could have found the existence of goodwill or "going concern value" in the case at bar, it is necessary to define what in law is cognizable as a "going concern."[4] A debtor should not be regarded as a going concern "if at the time of [the alleged transfer] he was financially dead or mortally wounded." *In re Fred D. Jones Co.*, 268 F. 818, 819 (7th Cir. 1920). In general, a business would no longer be a going concern where it is inoperative. For example, in *Langham, Langston & Burnett v. Blanch-*

*ard*, 246 F.2d 529 (5th Cir. 1957), the court noted that the bankrupt, a mining company which had drilled wells but shortly thereafter had ceased all mining operations, could not properly be valued as a going concern. The same was found to be the case in *Trask v. Susskind*, 376 F.2d 17, 20 (5th Cir. 1967), which held that there is no attempt to transfer the goodwill of a going concern where the business has itself voluntarily declared bankruptcy and ceased doing business. *Id.* at 20.

■ Given these various definitions and principles, the jury reasonably could have found the existence of both goodwill and "going concern value" in the bankrupt. First, the jury could have found that as of the time of the alleged transfer the Sullivan Company was a going concern. There was no evidence that the Sullivan Company had declared bankruptcy and ceased doing business as had the bankrupt in *Trask*. The contention of the defendants is not that as of the end of the business day on April 22, 1970 the company was *actually* out of business; indeed, they admit that as of that day some seventeen customers were still being serviced. (Admitted Facts 17, 55). Rather, they contend that in light of the financial conditions of the company and the impending levy of the IRS upon its accounts receivable the next morning, as of the end of that day the company was *constructively* no longer a going concern in that it would be unable to resume business the next day. In addition to the fact that the cases cited above seem to require an actual cessation of business to find a firm no longer a going concern, there was evidence that the Sullivan Company had been operating heavily in debt for some time, that the IRS levy would have affected only past due accounts and not future receivables, and that the company had on past occasions found last-minute finances to help it remain afloat. Thus, the jury could reasonably have inferred that

4. Strictly speaking, the continued existence of a going concern is not necessary to the existence of "going concern value" if, as noted above, there exist willing buyers for the aggregate resources of a firm. But as no evidence of the existence *vel non* of such buyers was introduced in this case, the existence of "going concern value" here, practically speaking, is dependent upon the bankrupt's still having been a going concern at the time of the transfer.

the company could have continued in operation under its circumstances for some additional period of time, remaining at least temporarily unaffected by any threatened or actual IRS levy, and that it was therefore still a going concern.

Given the existence of a going concern, there was ample evidence to support a jury finding of the existence both of goodwill and "going concern value." For instance, there was evidence that many customers had been satisfied with the services provided by the bankrupt, and in particular as orchestrated by the defendant Otte; that the guards provided by the bankrupt were often peculiarly qualified for the service of particular customers because of their possession of FBI security clearances; and that there was a knowledge by the bankrupt of the needs of its customers, which knowledge was reflected in a detailed company manual and utilized in the assignment of guards to specific customers. There was evidence that many of the Sullivan Company's customers had been with it for years. In addition, there was evidence that prior to the alleged transfer the various customers had agreed that they would remain with the bankrupt if it were transferred so long as the new company retained the bankrupt's employees and guard services were continued uninterrupted. And there is evidence that within two or three days after the transfer thirteen of the bankrupt's seventeen customers were being serviced by defendant Watts. From all of these facts

the jury could reasonably have found both that degree of internal arrangement and juxtaposition of resources and external customer satisfaction which would amount to the existence of goodwill and the *Nathanson Bros.* increment of "going concern value."[5]

In conclusion, therefore, there was sufficient evidence in the record upon which the jury could find the existence of property of the Sullivan Company which was transferred to the defendant Watts.

■ The second ground asserted by the defendants Watts, Consolidated and Recklitis, and adopted as well by defendants Otte and Sullivan, in support of their motion for judgment, notwithstanding the verdict is that there was insufficient evidence of a diminution in value of the estate of the bankrupt as a result of any transfer which the jury may have found to have taken place. It is not quite clear what contentions the defendants intend to raise by this ground. To the extent that their argument is simply that no "property" was transferred from the bankrupt's estate, that contention has already been considered. Defendants appear to be arguing, however, that even if "property" was transferred from the estate, it was not property of any value, as the Sullivan Company could not by virtue of its precarious economic condition have realized anything from the sale of that property. To some degree, the concept of property with no value may be internally

---

**5.** Defendants' motion for judgment notwithstanding the verdict attacks the sufficiency of the evidence to prove the existence of "property," including goodwill and "going concern value," in the hands of the bankrupt at the time of the alleged transfer, rather than the sufficiency of evidence of a "transfer." The latter issue would be somewhat interesting in the context of goodwill and "going concern value." It has been said that "[o]rdinarily, goodwill cannot be transferred separate and apart from tangible assets," that goodwill moves only where there is a "transfer ... of the corporation[ ] as a going concern." *Trask*, 376 F.2d at 20. Certainly, "when the *entire* assets of a business are sold, there is a presumption that good will passes." *United Tool & Industrial Supply Co. v. Torrisi*, 356 Mass. 103, 106, 248 N.E.2d 266 (1969). But the test of whether goodwill has

been transferred is not necessarily whether all or substantially all of a business' other assets have been transferred—although that would suffice under *United Tool*—but rather "whether the assets which are [transferred] are sufficient to enable the purchases to 'go on in real continuity with its past.' (*Mutual Life Ins. Co. v. Menin*, 2 Cir., 115 F.2d 975)." *Merry Hull & Co. v. Hi-Line Co.*, 243 F.Supp. 45, 51 (1965). This same analysis would seem to apply to "going concern value." With evidence supporting a finding of a transfer of the aggregate of employees and most customers, of guard schedules and manuals, and of at least temporary occupation and use of office space and equipment, the jury would be justified in finding a transfer as well of goodwill and "going concern value."

contradictory in light of the definition of property as any thing of *value*, which thus ought to be preserved to the benefit of the bankruptcy trustee.

In any event, assuming that it is ontologically permissible to speak of entirely valueless property, it is clear that in this case the same evidence which permitted the jury to find the existence of property would permit it to find that that property had some value. And, as to certain of the types of property which the evidence permitted the jury to find, such property has value as a matter of definition. That is, goodwill and the *Nathanson Bros.* "going concern value" represent the *values* that attach to a firm by virtue of customer satisfaction and internal coordination and arrangement of resources. For the jury to find such property to exist means of necessity that the bankrupt *could* have sold it, and thus realized some price in conjunction with a transfer of the operations of the business, all contrary to the defendants' contention. Finally, to the extent that the defendants argue under this ground that no property of the bankrupt of the type involved in this case could have had any value because the company was not at the time of the transfer a going concern, that contention has already been answered above. Thus the jury could reasonably have found the bankrupt's estate to have been diminished by virtue of the transfer which it found it to have occurred.

▐▌ Finally, it remains to treat of the separate arguments of defendant Otte and Sullivan. Defendant Otte essentially only adopts the arguments of defendants Watts, Consolidated and Recklitis. As those defendants did not address themselves to liability under Count III, and as the other arguments of those defendants have already been dealt with, defendant Otte's liability under Count III can only be sustained.[6] Turning to the motion of defendant Sullivan, he too basically adopts the arguments of his co-defendants. The only new arguments he advances pertain to Count III, under which he argues both that the evidence was insufficient to connect him with the fraudulent transfer scheme of defendants Watts, Consolidated, Recklitis and Otte and that the verdict against him (and Otte) on Count III is inconsistent with the verdict on that count for defendants Watts, Consolidated and Recklitis. The second argument may be dismissed summarily. No authority is cited by Sullivan for the proposition that a verdict supported by sufficient evidence is to be overturned and a judgment for the moving party entered simply because the jury did not find against other defendants which found against him. Indeed, while verdict inconsistency is sometimes a ground for the awarding of a new trial, *see infra*, the sole issue on a motion for a judgment notwithstanding the verdict is the sufficiency of the evidence and the law to support the verdict as it concerns the moving party only. *Garrison v. U. S.*, 62 F.2d 41, 42 (4th Cir. 1932); *see generally*, 9 C. Wright and A. Miller, Federal Practice and Procedure, § 2531 (1971). And as to the sufficiency of the evidence, the jury could reasonably have found that Sullivan breached his fiduciary duty to the bankrupt by participating in a transfer of the corporation's property without fair consideration at a time when the corporation was insolvent. The evidence showed that defendant Sullivan was President and a director of the bankrupt. "The directors of a commercial corporation stand in a relation of trust to the corpora-

---

**6.** By adopting the arguments of co-defendants, Otte preserves those arguments only to the extent *they were made*. While defendants Watts, Consolidated and Recklitis argued that there was insufficient evidence of the existence of property or of a transfer of such which diminished the estate in value, *they* did not argue that even if there was sufficient evidence as to these two factors that that would not rise to the level of a breach of fiduciary duty under Count III, and thus *Otte himself* may not be heard to so argue. Given the nature of an officer's fiduciary duty to his corporation, *see infra*, the argument that participation in a fraudulent transfer under the Bankruptcy Act is not violative of that duty would be rather unlikely to prevail. In any event, since it is held above that there is sufficient evidence to sustain the jury's verdict against Otte under Count I, it is legally irrelevant whether there is also sufficient evidence to sustain its verdict against him under Count III.

tion and are bound to exercise the strictest good faith in respect to its property and business." *Goodwin v. Agassiz*, 283 Mass. 358, 361, 186 N.E. 659 (1933). They have "a duty of reasonably protecting and conserving its interests." *Lincoln Stores, Inc. v. Grant*, 309 Mass. 417, 421, 34 N.E.2d 704 (1941). The jury could reasonably have found Sullivan not to have lived up to his legal duty even though his failure to do so was not motivated by a desire for personal profit. This was not the usual case of double-dealing or other conflict of interest. Nonetheless, there was evidence that Sullivan had been a party to earlier attempts by defendants Watts and Consolidated through their President, defendant Recklitis, to purchase the bankrupt for valuable consideration, that those efforts had culminated in the April 22, 1970 meeting to which the IRS was a party, that the result of that meeting was that the Recklitis was unwilling to pay the $50,000 which he had previously offered to purchase the bankrupt. The jury could reasonably have found that Sullivan then abandoned his fiduciary duty toward the corporation and, in his own words, "handed over the business" to Recklitis. There was thus sufficient evidence to find Sullivan liable under Count III.[7]

In sum, as to all defendant and all relevant counts, there is sufficient evidence in the record from which the jury could reasonably find liability. The various motions for judgment notwithstanding the verdict are denied.

## II. MOTIONS FOR NEW TRIAL

Defendants Watts, Consolidated and Recklitis move for a new trial pursuant to F.R.Civ.P. 59(a) on several grounds: insufficiency of the evidence, improper admission of opinion evidence, improper instruction of the jury, improper conduct of opposing counsel, and excessiveness of the damage award. The three defendants seek, in the event that a full new trial is not ordered, a partial new trial on the issue of damages above, or a remittitur. Defendant Otte in-

corporates these arguments and adds in addition that the verdict on Count III was against the weight of the evidence and inconsistent with the verdicts on Count I and II. Defendant Sullivan also adopts the arguments of Watts, Consolidated and Recklitis and attacks the verdict on Count III as contrary to the evidence and court's instructions.

F.R.Civ.P. 59(a)(1) provides: "A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." In *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940), the Supreme Court in passing catalogued, though not exhaustively, some of the grounds upon which new trials may be granted: "The motion for a new trial may involve the discretion of the court insofar as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other means, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."

Defendants Watts, Consolidated and Recklitis first argue for a new trial on the ground that verdict on Count I was against the weight of the evidence for the same reasons that they argued that they were entitled to a judgment notwithstanding the verdict on that count: i.e., that there was insufficient evidence of "property," that there was insufficient evidence of a diminution in value of the estate, and that there was insufficient evidence of damages. In the First Circuit, the standard for granting a new trial on the ground of insufficiency of the evidence is as follows:

A trial court, in assessing whether to grant a new trial for lack of legally sufficient evidence, does not properly do so

---

7. In any event, as it is held above that there is sufficient evidence to find against Sullivan un-der Count I, Count III is unnecessary to sustain the judgment against him.

merely because it might have come to a result different from that reached by the jury. The district court should order a new trial only when convinced that a miscarriage of justice would otherwise obtain. Where credibility of witnesses is at issue, special care should be taken not to invade the province of the jury.

*Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d at 990. As to the defendants' first two arguments on the insufficiency of the evidence, the evidence has been set forth *supra* in consideration of the motion for judgment notwithstanding the verdict. It is clear from that discussion that the evidence supporting a finding of the existence of various types of "property" in the bankrupt and of a diminution in the bankrupt's estate was quite substantial.

■ Turning to the third contention of insufficiency of the evidence concerning damages, less summary treatment is in order. That issue was not discussed earlier on the motion for judgment notwithstanding the verdict because the defendants had waived it by failure to include it in their motion for a directed verdict. See p. 969, *supra.* But the making of a specific motion for a directed verdict is *not* a prerequisite for the pressing of a subsequent motion for a new trial, and the damages issue may thus be raised in the present context. This argument of the defendants also appears to overlap with, if not to be indistinguishable from, the defendants' fifth argument on the motion for a new trial, namely, that the damages are excessive. These arguments shall be considered together.

■ In the First Circuit, damage awards even if "extremely high" are not to be overturned and a new trial granted where they are not "grossly excessive" or "shocking to the conscience." *LaForest v. Autoridad de las Fuentes Fluviales de Puerto Rico,* 536 F.2d 443, 447 (1st Cir. 1976). A "sort of irrationality" may have to appear. *Id.* In this case, the jury's damage award is not inconsistent with the evidence. Sullivan, himself, hardly a disinterested party, testified that in his opinion the business was worth one million dollars. Otte testi-

fied to the same effect. Beyond this, there was evidence that defendant Watts, in the year subsequent to the transfer from the bankrupt to it, had derived gross sales of some $680,000 from that portion of its business which was based on customers which had formerly been serviced by the Sullivan Company. It was for the jury to assess the credibility and significance of this evidence. *Rios,* 575 F.2d at 990. Aside from the admissibility issues to be addressed momentarily, this court is satisfied that the jury verdict of a $750,000 award was not "grossly excessive," nor perhaps even "extremely high." This court cannot conclude that there was a patent miscarriage of justice.

■ Turning to the defendants' second argument, their contention is that Sullivan's opinion testimony as to the value of the Sullivan Company at the time of the alleged transfer was improperly admitted, and that Otte's opinion was dependent solely upon Sullivan's and thus equally improperly admitted. Defendants cite *Winthrop Products Corp. v. Elroth Co.,* 331 Mass. 83, 85, 117 N.E.2d 157 (1954) and *Maher v. Commonwealth,* 291 Mass. 343, 348–49, 197 N.E. 78 (1935) for the proposition that while the owner of a business is usually competent to offer an opinion as to its value, he may not do so when his opinion is not based on personal knowledge or is based only on the opinion of others. They argue that at trial defendant Sullivan, the majority shareholder and President of the bankrupt, offered an opinion which was based solely on the opinions of others whom he had heard say that service businesses could be valued at the level of their gross sales. Thus Sullivan ventured the opinion that the Sullivan Company was worth approximately one million dollars. This error in the admission of evidence, argue the defendants, warrants the granting of a new trial.

This argument of the defendants fails in several respects. The cited *Winthrop Products* case holds that an owner of a corporation with knowledge of its property may testify as to the value of that property. Similarly, the *Maher* case recognizes that a landowner ordinarily may testify as to the

value of his land because "commonly he is familiar with its characteristics and its availability for actual and potential valuable uses." 291 Mass. at 348, 197 N.E. 78. But when a landowner was testifying based "in substantial respects" upon the opinions of real estate experts and had had no opinion of his own prior to talking with such experts, and where he "also gave weight to the element of sentimental value," the testimony was held "based upon erroneous foundations" and improperly admitted. *Id.* at 348–49, 197 N.E. 78. In the present case, however, Sullivan's testimony demonstrated substantial familiarity with the operations of the business. While he did testify that he was basing his opinion in part upon the statements of others, no element of sentimental value was included within his valuation, and his personal familiarity with the business clearly was a substantial element. Sullivan's testimony thus might well be admissible under *Maher* and its weight a matter for the jury. In any event, in the federal courts the Federal Rules of Evidence are controlling on questions of admissibility, not state decisional law.

An owner's testimony as to the value of his own property could be admissible either as an opinion by a lay witness "based on ... personal perception" and "helpful to a clear understanding of his testimony or the determination of a fact in issue" under Rule 701, or as an expert opinion by one who is "qualified as an expert by knowledge ... [or] experience" under Rule 702. "[A]n owner, because of his ownership, is *presumed* to have *special knowledge* of the property and may testify as to its value." *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) [emphasis supplied]. "The opinion testimony of a landowner on the valuation of his land has been admitted in federal courts without further qualification." *United States v. 3,698.63 Acres of Land*, 416 F.2d 65, 67 (8th Cir. 1969) (citing *Sowards*). *Sowards* rejected an owner's

opinion testimony because his testimony revealed it to be speculative and conjectural, thus rebutting the presumption of special knowledge which would otherwise attach. But in the instant case Sullivan's testimony revealed him to have adequate knowledge of his business to permit the admission of his opinion as to its value, leaving the issue of the weight to be accorded that testimony to the jury.[8] Otte's testimony was similarly admissible. No new trial is warranted by the evidentiary decisions taken by this court at trial.

■ Defendants Watts, Consolidated and Recklitis advance as a third ground for the granting of a new trial the argument that the court improperly instructed the jury as to the test for determining the value of any property of the bankrupt transferred to defendants and also that the value of any back wages owed by the bankrupt which were paid by defendant Watts was not to be treated by the jury as consideration for any transfer.

On the first issue defendants argue that an instruction on value based upon what a willing buyer would pay a willing seller was inappropriate inasmuch as a seller in the desperate financial position of the Sullivan Company could hardly be characterized as willing. But this ignores the testimony concerning prior negotiations between the bankrupt and defendant Recklitis regarding the possible sale of the company, from which a reasonable inference is permitted that the bankrupt would in fact have been a willing seller at the time of the transfer without consideration which the jury found to have taken place in this case. And the proper measure of damages is that amount of which the trustee, as representative of the bankrupt's creditors, was deprived by virtue of the transfer of assets at issue in this case. Certainly the trustee, seeking to maximize the return to those creditors, would have been in the position of a willing

**8.** It should be noted that the jury apparently did not credit that testimony fully, as the damage award was significantly less than Sullivan's one million dollar value estimate. In arriving at its figure, the jury may well have taken into account the testimony that in the year following the transfer defendant Watts grossed some $680,000 from former customers of the bankrupt.

seller. Defendants, by their actions, deprived the trustee and this court, of the opportunity to ascertain precisely what amount could have been realized from the assets. As to the other claimed erroneous instruction, there was testimony that some time after Watts took on the employees of the bankrupt on or about April 23, 1970, it paid such employees back wages owed them by the Sullivan Company in an amount totaling $39,000. This court instructed the jury that any such payment was not to be taken into account in evaluating the adequacy of any consideration paid by the defendants for the transfer of Sullivan Company assets. As there was no evidence that any such payment was bargained for by the bankrupt as part of the transfer—or, indeed, that the bankrupt engaged in any bargaining whatsoever regarding this particular transfer—it was proper to instruct the jury to the effect that this was not consideration. In any event, where the jury reasonably found the value of the property transferred to defendants to be some $750,000, and where there was no evidence of any direct consideration paid by the defendants for the transferred property, any error involved in instructing the jury not to consider the $39,000 if they found it to have been paid would be harmless under Fed.R.Civ.P. 61: "[N]o error or defect in any ruling or order or in anything done or omitted by the court . . . is ground for granting a new trial . . . unless refusal to take each such action appears to the court to be inconsistent with substantial justice." No problem of substantial justice appears when, under the relevant statute, consideration is "fair," "in good faith," "in exchange," and "a fair equivalent." Old 11 U.S.C. § 107(d)(1)(c). *See, e.g., Misty Management Corp. v. Lockwood,* 539 F.2d 1205, 1212 (9th Cir. 1976). Under such a definition, $39,000 could not be "fair consideration" for property found by the jury to be worth $750,000. No new trial is warranted on this ground.[9]

■ The final ground on which defendants Watts, Consolidated and Recklitis base their motion for a new trial is an argument that opposing counsel exceeded the limits of proper argument in his closing to the jury with the result that the jury verdict was ostensibly inflamed by passion and prejudice rather than based on reason. Counsel for the plaintiff made several references in his closing to the fact that defendant Recklitis had once been convicted of criminal fraud and argued that he was the mastermind of a scheme in this case to obtain the only valuable assets of the Sullivan Company for no consideration. Counsel asked rhetorically whether the jury would believe "a convicted fraud" and urged the jury not to fall for Recklitis' defense that nothing of value had been transferred to defendants". "That's his final con, to try and con you. Don't fall for it, please." The Federal Rules of Evidence specifically allow the use *of prior convictions to impeach a witness* under certain circumstances. F.R.E. 609(a). But those same rules in general prohibit the use of evidence of prior crimes to prove a propensity for committing similar acts or offenses from which it may be inferred that the act or offense at issue in the trial was in fact committed by a defendant. F.R.E. 404(b). The rationale behind this general rule is that the probative value of the evidence of the prior crime is outweighed by the "dangerous baggage of prejudice, distraction from the issues, time consumption, and hazard of surprise." Clearly, McCormack's Evidence, 2d ed., 1972, 445. Thus if an argument of counsel improperly attempts to focus the jury's attention on the character of a defendant so as to play upon prejudice and distract from the issues truly at hand, a new trial might be justified. But in this case, there is no evidence from the jury's verdict—which, as stated above, was quite within the bounds of the evidence—that it was the result of prejudice. Nor was the jury's verdict directed only at

**9.** Defendants also appear to argue that they are entitled to a set-off of some $39,000 from the verdict as determined by the jury. But defendants did not claim such a set-off or counter-claim in their answer nor was such an issue effectively tried to the jury. *See* F.R.Civ.P. 15(b).

Recklitis, the defendant who was the object of the purportedly prejudicial remarks. And counsel's statements in any event were not egregious either in kind or in number. "While counsel's argument might have been in better taste, yet we are not convinced that it contained matter likely to mislead the jury or to prevent a fair verdict. In arguing to a jury, counsel must properly have some latitude so long as prejudice does not appear." *Schwartz v. Northwest Airlines, Inc.*, 275 F.2d 846 (2d Cir. 1960). Finally, it should be noted that at no time during the trial did defendant's counsel take exception to any remark made by opposing counsel, nor did he make any formal objection to any of the matters he now contends were so prejudicial as to justify the granting of a new trial. "If in fact defendant's counsel felt aggrieved by the alleged prejudicial comments and conduct, he should have called the matter to the court's attention so as to give the court an opportunity to take corrective action." *Faudree v. Iron City Sand & Gravel Co.*, 315 F.2d 647, 651–52 (3d Cir. 1963). Accordingly, a new trial is not warranted in this case on the grounds of improper conduct of counsel or a verdict which is the product of passion, bias or prejudice.

Finally, it remains to deal with defendants Otte and Sullivan's additional arguments for granting a new trial on their behalf. Both defendants argue that the evidence was insufficient as to Count III. But the same evidence which was held sufficient earlier in the opinion to withstand a motion for judgment notwithstanding the verdict is also sufficient to satisfy this court that there was no miscarriage of justice as to Count III. There was ample evidence to support a finding of a breach by defendants Otte and Sullivan of their fiduciary duty to the corporation of which they were officers. Defendant Otte also argues that the verdict against him on Count III was inconsistent with the verdicts on Counts I and II. This court is at a loss to discern any inconsistency among the verdicts on the three counts as to defendant Otte. It is perfectly consistent to find that Otte participated in a transfer of assets during a time of insolven-

cy (Count I) and in a breach of fiduciary duty (Count III) but did not possess an actual intent to defraud (Count II). And if defendant Otte is seeking to raise any inconsistency between his being found liable under Count III and defendants Watts, Consolidated and Recklitis being found not liable—as defendant Sullivan sought to do on his motion for judgment notwithstanding the verdict—no new trial is justified, as there was ample evidence to find against defendant Otte under Count III and he is not prejudiced by any failure or inconsistency on that count as regards other defendants.

As to defendant Sullivan, he argues that the verdict against him on Count III was "contrary to the instructions by the Court." But as no specific instances of inconsistency are raised, and as the verdict against Sullivan, as against Otte, seems perfectly proper under this Court's instructions, no new trial is in order.

In sum, all motions of all defendants for judgment notwithstanding the verdict or for full or partial new trials or for a remittitur are denied. The verdict and judgment as entered shall stand.