In re JOTAN, INC., Debtor.

Jotan, Inc., a Florida corporation
and Southland Container Corp.,
a Texas corporation, Plaintiffs,

v.

Jeff Barnett, an individual, Alton E. Thompson, an individual, Bob McCririe, an individual, John Holcomb, an individual, Nikki Holcomb, an individual, and Eastern Seaboard Packaging, Inc., a corporation, Defendants.

Bankruptcy No. 98–9633–BKC–3F1.
Adversary No. 98–266.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Nov. 25, 1998.

Gardner F. David, John Tucker, Jacksonville, FL, for debtors.

Edwin W. Held, Charles McBurney, Jacksonville, FL, for defendants.

### PRELIMINARY INJUNCTION

JERRY A. FUNK, Bankruptcy Judge.

This Proceeding came before the Court for a full evidentiary hearing on Monday, November 23, 1998 on the Plaintiffs' Jotan, Inc. and Southland Container Packaging Corp. (collectively, "Plaintiffs," "Employer" or "Company") Motion for Entry of a Temporary Restraining Order and/or Preliminary Injunction and upon the Plaintiffs' Amended Adversary Complaint to Enjoin Violations of Non–Compete. Upon the evidence presented, the Court considers whether Plaintiffs demonstrated that under the law guiding this Court that the evidence presented is sufficient to support the issuance of a preliminary injunction and makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

On November 13, 1998 this Court entered a Temporary Restraining Order enjoining Alton E. Thompson ("Thompson"), Jeffrey Barnett ("Barnett"), Bob McCririe ("McCririe") John Holcomb, Nikki Holcomb, and Eastern Seaboard Packaging, Inc. ("ESP") (collectively "Defendants") from violating the terms of the employment agreements of Thompson, Barnett, and McCririe, former Jotan employees. (Doc. 8.) Plaintiffs seek to convert this temporary restraining order to a preliminary injunction.

Jotan is a Florida corporation with its principal place of business in Jacksonville, Duval County, Florida. Southland is a Texas corporation with its principal place of business in Jacksonville, Duval County, Florida, and a wholly owned subsidiary of Jotan.

Jotan, through Southland, is engaged in the business of distributing packaging and shipping supplies through service and distribution centers located throughout the United States to industrial, moving and storage, air freight, and perishable food customers. Plaintiffs' core business includes the sale of packaging material to industrial users on a "just on time as needed" basis, which makes Plaintiffs' working relationship with its customers critical to Plaintiffs' successful business operations.

Plaintiffs have spent considerable amounts of time, money, and effort to develop and maintain these customer relationships and the related goodwill, and have also taken steps to protect these legitimate business interests.

On November 22, 1996, Alton E. Thompson and Jotan entered an Employment Agreement. (See Exhibit 1.) On April 18,

1997, Jeff Barnett and Jotan entered an Employment Agreement. (See Exhibit 2.) Pursuant to these agreements, both Thompson and Barnett held important managerial positions and were significantly involved in the operation of Plaintiffs' industrial business, sales practices, sales personnel and dealings with customers. Thompson spent 1–2 days per week making sales calls and visiting vendors of Plaintiffs and Barnett was Plaintiffs' National Sales Representative. As such, Thompson and Barnett had access to Plaintiffs' confidential information such as information about costs, profits, customer needs and purchasing habits, pricing, sales, lists of customers and other information of a similar nature.

Both Thompson and Barnett's Employment Agreements with Jotan included provisions intended to protect Plaintiffs' above identified legitimate business interests. These agreements acknowledged that Plaintiffs would suffer irreparable harm if these non-compete provisions were violated, and accordingly agreed that the entry of an injunction would be the appropriate remedy to prevent and/or limit such conduct. The agreements also provided that Thompson and Barnett would not disclose Plaintiffs' confidential business information and trade secrets.

In October of 1998, Jotan began negations with ESP regarding the possible sale of portions of Plaintiffs' business. Because ESP was a competitor of Plaintiffs, before such negotiations began, Jotan required ESP to execute a Confidentiality Agreement. (Pl. Ex. 4.) This Confidentiality Agreement provided that ESP would use the information obtained from Jotan during the negotiations only for purposes of a purchase transaction with Jotan, and would not use the information to the detriment of Jotan. Thereafter, Barnett was selected as the "chief negotiator" for Jotan in these sale negotiations, and therefore had extensive dealings with ESP.

Following these dealings with ESP, on Monday, November 9, 1998, and while still employed with Jotan, Thompson, Barnett and McCririe became employees of ESP, a competitor of Plaintiffs and previously a prospective purchaser of a portion of Plaintiffs' business and assets. After becoming ESP's employees, on Monday, November 9, 1998, Thompson, Barnett and McCririe voluntarily, and without prior notice, terminated their employment with Plaintiffs. Immediately following Thompson, Barnett and McCririe's employment with ESP, a number of other key sales people and location managers of Plaintiffs were hired by ESP.

On the Thursday prior to resigning, each of these three employees demanded $50,000.00 from Plaintiffs. The employees set a deadline for such demand, threatening Plaintiffs that the circumstances would drastically change if this payment was not made. The deadline lapsed and the employees began employment with Plaintiffs' competitor, ESP. After filing for Chapter 11 relief and obtaining the use of cash collateral[1], Plaintiffs offered to these employees if that they would return to their positions, they would receive the demands they previously made. The employees rejected such an offer and continue to work for ESP.

On November 9, 1998 Alton E. Thompson ("Thompson") and ESP entered an employment agreement. (Pl. Ex. 5.) Schedule A of this agreement provides Thompson's job description as a General Manager with ESP as follows:

> To be responsible for all aspect of sales, operations and administration of assigned locations; To represent E.S.P. in an ethical manner; To take all necessary steps to protect the assets of the corporation; To take all possible actions to enhance the value of the business.

Schedule B of that agreement, setting forth compensation, provides:

| | |
|---|---|
| Base Salary | $100.000.00 |
| Signing Salary | $ 25,000.00 |
| Quarterly Bonus | $ 12,500.00 per quarter. Guaranteed for Year 1 of employment plus 5% of profit before home office expense. |

*Five (5) percent equity participation in the Jotan industrial business of the territory.*
*Full indemnity on employment contract.*

(emphasis added).

After November 9, 1998, Thompson visited two (2) customers of Plaintiffs, Colorado Box

---

**1.** Certain banks collectively have a security interest in all of Plaintiffs assets. These banks are currently considered to be under secured but have agreed to Plaintiffs' use of cash collateral under certain restrictions.

Beef and Cantex. In reference to Colorado Box Beef, Thompson provided assurances to the Jotan customer that ESP would be able to service it in a similar fashion as he did when he worked for Jotan. Following this customer call, Thompson stopped by Cantex, another Jotan customer in the area, to thank it for past business.

At the evidentiary hearing, the Court heard testimony from Jerry Callahan ("Callahan"), Chief Executive Officer of Dalton Box, Alton E. Thompson, and Raleigh Minor, President and Chief Executive Officer of Jotan. Callahan, a tentative purchaser of a portion of Jotan, Inc., testified that these employees were valuable assets of Plaintiffs. He further testified that continued loss of employees from Jotan and Southland would detrimentally affect the value of these companies. Callahan and Thompson presented conflicting testimony of a telephone call between the two of them concerning Thompson's future employment and opportunities outside of Jotan. Raleigh Minor testified that Jotan would be irreparably harmed should employment agreements between the three employees and Jotan not be enforced.

Defendant's counsel argued that the original temporary restraining order was over broad but did not elaborate on that position. No evidence was presented concerning the reasonableness of the terms of non-competition under the agreements between Jotan and these employees.

### CONCLUSIONS OF LAW

■ The Court notes at the outset of its discussion that the good will and reputation of a corporation in Chapter 11, to the extent that there is one, is property of the bankruptcy estate. *See Sheppard's Dental Centers, Inc. v. Southwest SDC, Inc. (In re Sheppard's Dental Centers, Inc.),* 65 B.R. 274, 276–77 (Bankr.S.D.Fla.1986). *Cf. Glosband v. Watts Detective Agency,* 21 B.R. 963, 971– 75 (D.Mass.1981). Parties interfering with or trying to take away from such good will and reputation are in violation of the automatic stay afforded to debtors seeking bankruptcy relief and subject to this Court's authority with respect to violations of that stay.

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 1334; 11 U.S.C. §§ 105 and 362; 28 U.S.C. § 157; and Bankruptcy Rules 4001, 7001 and 7065.[2] The Court addresses whether a preliminary injunction should be issued concerning the various parties in this proceeding.[3] The Court has the authority to issue a preliminary injunction pursuant to Fed.R.Bankr.P. 7065 which makes Fed.R.Civ.P. 65 applicable to adversary proceedings. The Eleventh Circuit recently stated that a court may ...

> grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. In this Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to the four requisites.

*McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (citations omitted).

---

**2.** Resolution of the Counts of the Amended Adversary Complaint to Enjoin Violations of Non–Compete Agreements affects the reorganization process and the bankruptcy estate. *See Dearborn Process Service, Inc. v. Storner,* 149 B.R. 872 (Bankr.N.D.Ill.1993) (Chapter 11 debtor obtained preliminary injunction to prevent former officer and director from diverting business from debtor), *citing Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746 (7th Cir.1989); *Stadium Management Corp. v. Connecticut Bank and Trust Co., N.A.,* 95 B.R. 264 (D.Mass.1988) (Court had jurisdiction to enjoin foreclosure sale of property owned by debtors' non-bankrupt subsidiary as foreclosure would have detrimental effect on a debtors' ability to reorganize); *Elsinore Shore Associates v. Local 54,* 820 F.2d 62 (3rd Cir.1987) (Debtor's action to secure injunction enjoining union from striking was a core proceeding as matter effecting the administration of estate).

**3.** Defendants ask the Court to rely on *Golden Distributors, Ltd. v. Auburn Merchandising Distributorship, Inc. (In re Golden Distributors, Ltd.),* 134 B.R. 750 (Bankr.S.D.N.Y.1991). This proceeding is factually distinguishable from that opinion because the former employees in that case were at-will employees. *Id.* at 753.

See *DSR v. Manuel (In re Hamilton Roe Int'l),* 162 B.R. 590 (Bankr.M.D.Fla.1993).

### A. Defendants Thompson and Barnett.

■ The evidence presented concerning Thompson and Barnett persuades this Court to issue a preliminary injunction enforcing the terms of the agreements these parties knowingly entered into. The Court finds a substantial likelihood that Jotan will succeed on its claim. The agreement between ESP and Thompson provides an incentive for Thompson to work toward obtaining Jotan's business. Thompson will be compensated in addition to his regular salary from ESP for taking business from Jotan in favor of ESP.

Additionally, under the terms of Thompson's agreement with ESP, Thompson is provided full indemnity on his employment contract. In the Court's eyes, this indemnity can only concern Thompson's contract with Jotan. It appears that ESP was willing to roll the dice, so to speak, in hiring Thompson. ESP's indemnity of Thompson for breaching obligations under his former employment agreement and the incentive compensation for obtaining Jotan's business weigh heavily in favor of this Court's issuance of a preliminary injunction.

The Court is persuaded irreparable harm will be suffered if the injunction is not issued. Thompson testified that he has already called on two former Jotan customers. Thompson's agreement with ESP provides incentive for Thompson to obtain Jotan business. Testimony from both Callahan and Raleigh Minor support the common sense notion that the pursuit of Jotan business by former Jotan employees, having contacts and relationships developed while employed with Jotan, would irreparably harm Jotan. This type of activity is the exact activity the Court spoke of concerning violating the automatic stay. Plaintiffs will in no way be better off by losing customer base, reputation, and going concern value due to the activities of their former employees through the encouragement of their competitors. Jotan is still in operation and an ongoing business concern, although it is considering alternatives such as selling portions of its business. The protection of Plaintiffs' customer relationships, goodwill and confidential information is critical to Plaintiffs' current operations, whether to make the Chapter 11 reorganization plan viable and/or to sell portions of the business for its greatest value.

The Court finds the threatened injury to the Plaintiffs outweighs whatever damage the proposed injunction may cause the opposing parties. By enjoining Thompson and Barnett, this Court is not saying they can not work. However, the Court does find that Thompson and Barnett can not work in violation of their employment agreements with Jotan. Plaintiffs seek reorganization under Chapter 11. Part of Plaintiffs' plan to reorganize is selling portions of their business and assets. Plaintiffs are vigorously pursuing such sales. ESP's encouragement of Plaintiffs' former employees to seek Plaintiffs' business can do nothing but decrease the value of Plaintiffs' business and assets. Additionally, ESP has provided generous compensation and indemnity to Thompson. ESP's indemnity shows this Court that Thompson and ESP contemplated potential litigation when entering their agreement.

■ Finally, the Court finds the injunction would not be adverse to the public interest. This Court, with concern to public interest, balances the enforcement of valid contracts with constraints on exercising free choice. Florida law encourages the enforcement of valid restraints on trade and commerce.[4] The public is best served by enforcing valid contracts. Though making no decision without evidence being presented by both parties, the Court believes the terms of the agreements in question are legally enforceable under Florida law. Additionally, creditors will be better off by the issuance of a preliminary injunction through the preservation of the value of Plaintiffs' business and assets.

---

4. Florida Statutes § 542.335, titled "Valid restraints of trade or commerce", provides that "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited."

The Court, while not hearing testimony from Barnett nor having evidence of an agreement between Barnett and ESP, is persuaded from the evidence presented of the likelihood that ESP offered similar terms of compensation and indemnity to Barnett.[5] For these reasons the Court will temporarily enjoin both Thompson and Barnett from violating the terms of their individual agreements[6] with Jotan. No party presented evidence concerning any unreasonable restrictions in these agreements. Therefore, the individual agreements will be controlling as to the terms of Thompson and Barnett's enjoinment.

### B. Defendant ESP.

■ Following the discussion above based on the 11th Circuit holding in *McDonald's Corp. v. Robertson,* the Court enjoins ESP from enabling or encouraging violation of the terms of any employment agreements between Jotan and former Jotan employees. This Court has no reason to believe ESP is not a reputable company seeking to do business within the guidelines of the law. However, ESP's indemnity of Thompson persuades this Court of ESP's preconceived knowledge of potential litigation concerning Thompson's agreement with Jotan. To the fullest extent allowed under Fed.R.Civ.P. 65, ESP is preliminarily enjoined from further conspiracy to work around Jotan's employment agreements with current and former Jotan employees.

### C. Defendant McCririe.

The Court finds no evidence to substantiate a preliminary injunction restricting McCririe. Unlike Thompson and Barnett, no evidence was presented concerning an employment agreement with Jotan. However, the Court will note that it will deal with issues concerning McCririe at final hearing should sufficient evidence be presented to the Court. Further, the Court notes ESP's

injunction as to all former Jotan employees having employment agreements with Jotan.

### D. Defendants John Holcomb and Nikki Holcomb.

The Court will not enjoin specifically John Holcomb or Nikki Holcomb. No evidence supporting the issuance of an injunction was presented concerning either defendant.

### CONCLUSION

Notwithstanding the Confidentiality Agreement between ESP and Jotan, the Court basically enjoins the parties from doing what they agreed not to do in the first place. The Court will not address other arguments made by counsel at this point. The Court will address such other arguments upon motion or at final hearing.

Therefore, it is **ORDERED:**

1. Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction is **Granted** in part and **Denied** in part.

2. This Preliminary Injunction is entered and effective as of 5:00 p.m., November 25, 1998.

3. Defendant Alton Thompson and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him are hereby enjoined from undertaking, either directly or indirectly, any of the following activities until further order of this Court:

A. **Hiring, recruiting, or attempting to recruit any employee or former employee of the Plaintiffs for themselves, or for any other person or business entity which is a competitor of the Plaintiffs, or a related entity of such competitor;**

B. **Soliciting any business for themselves or for a competitor of Plaintiffs, or a related entity of such competitor, from any of the Plain-**

---

**5.** Plaintiffs failed to produce an actual agreement between ESP and Barnett. However, there is no evidence before this Court that no such agreement exists. The Court has before it a contract between Jotan and Barnett. There is also testimony that Barnett is now employed by ESP. The Court makes no leap in reaching the conclu-

sion that ESP provided the same or similar terms to Barnett, that it provided to Thompson.

**6.** These agreements are attached as Exhibits 1 & 2. The Court notes slight differences in the terms of these agreements.

tiffs' current or prospective customers or a prospective customer which the Plaintiffs have solicited, planned to solicit or provided services to during the preceding twelve (12) months; and

C. Using or disclosing any confidential business information or trade secrets of Plaintiffs.

4. Defendant Jeff Barnett and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, are hereby enjoined from undertaking, either directly or indirectly, any of the following activities until further order of this Court:

A. Seeking or obtaining for Defendant Barnett a "Competitive Position" in the "Territory" with a "Competitor" of Jotan. For purposes of this Agreement, a "Competitor" of Jotan is any entity, individual, partnership, joint venture, association, firm or corporation engaged, wholly or in part, in "Business Activities"; a "Competitive Position" is any employment with a "Competitor" of Jotan in which Defendant Barnett will use or is likely to use any Confidential Information or Trade Secrets . . ., or in which Employee has duties for such "Competitor" of Jotan that relate to "Business Activities" and that are the same or similar to those actually performed by Employee for Jotan; "Business Activities" shall mean the wholesale distribution and sale of packing boxes, bags and other packaging materials for the moving and storage industry, the air freight industry and the perishables transportation industry; and "Territory" shall mean the geographic area consisting of the territory within two hundred and fifty (250) miles of each of the distribution centers operated by Employer in the following locations: All Jotan and Southland locations; and

B. Using or disclosing any confidential information or trade secrets of Plaintiffs.

## Exhibit 1

## EMPLOYMENT AGREEMENT

This Employment Agreement is entered into as of the 22 day of November, 1996, (the "Effective Date") between JOTAN, INC., a Florida corporation, including its successors, assigns, and affiliated companies (the "Company"), and Alton E. Thompson ("Employee").

Section 1. *Employment.* The Company hereby agrees to employ Employee and Employee hereby agrees to remain in the employ of the Company, for a three (3) year period commencing on the Effective Date (the "Employment Period").

Section 2. *Position and Duties.*

(a) The Board of Directors of the Company has appointed Employee as Vice President Sales and Operations of the Company.

(b) During the Employment Period, Employee shall report to the Board of Directors of the Company. Employee's services will be performed at the location designated by the Board of Directors.

(c) The duties of Employee shall be those assigned to Employee by the Board of Directors of the Company. Employee acknowledges that his duties may vary from time to time and he further acknowledges that the Company retains the flexibility to assign various types of duties to Employee. Employee does not have the authority to enter into any contracts on behalf of the Company or set salaries for any corporate employee without the prior approval of the Board of Directors.

(d) Excluding periods of vacation and sick leave to which Employee is entitled as set forth in Section 3(c) hereof, Employee agrees that during the Employment Period he shall devote his full business time to his responsibilities as described herein and shall perform such responsibilities faithfully and efficiently and to the best of his abilities. Employee will not work as an employee of any other person, business, or entity, including self-employment, while in the employment of the

Company, without prior written permission from the Company. Notwithstanding the foregoing, Employee may serve on corporate, civic or charitable boards or committees so long as such activities do not materially interfere with the performance of Employee's duties and responsibilities for the Company.

(e) The Company shall reimburse Employee for reasonable travel, lodging, entertainment and other business expenses incurred by him in connection with the Company's business, and Employee shall keep such receipts and maintain such records as required by Company policy.

Section 3. *Compensation.* During the Employment Period, Employee shall receive the following and benefits:

(a) <u>Salary.</u>

(i) Employee shall receive a salary of Eighty Thousand Two Hundred Dollars ($80,200.00) per annum ("Base Salary"). Employee's Base Salary shall be reviewed annually and may be adjusted, in the sole discretion of the Company, to reflect cost of living or the achievement of annual performance goals set by the Board of Directors or Compensation Committee of the Company.

(ii) If Employee achieves the performance goals referred to in clause (i) above, and Employee is then employed by the Company, then once per year, within forty-five (45) days of satisfying such goals as determined by the Board of Directors or Compensation Committee of the Company, Employee shall be entitled to receive such cash bonuses and stock options and/or other awards as determined by the Board of Directors or Compensation Committee of the Company.

(iii) Any salary payable to Employee shall be paid bi-monthly, in arrears, by Company check.

(b) <u>Life Insurance.</u> The Company shall use reasonable efforts to secure one or more policies of standard term life insurance on the life of Employee from a "AAA" rated provider providing, in the aggregate, a face amount of not less than $500,000 in the event of Employee's death during the Employment Period (with a provision for double indemnity in the case of accidental death) (the "Death Benefit") payable to a beneficiary chosen by Employee and to maintain such policy or policies in effect throughout the Employment Period, and to assign such policy to or pursuant to the directions of Employee at the termination of Employee's employment; *provided, however,* that the Company shall be required to secure and pay for such policy or policies only if the same is commercially available to the Company at a cost and pursuant to such terms and conditions as are acceptable to the Company. The life insurance benefit provided pursuant to this Section 3(b) shall be integrated with the Company's normal life insurance benefit program so that upon the death of Employee during the Employment Period in no event shall the Employees beneficiary be entitled to receive an amount in excess of the Death Benefit.

(c) <u>Vacation and Sick Leave.</u> Employee shall be entitled to vacation and sick leave in accordance with Company policy.

Section 4. *Termination.*

(a) This Agreement may be terminated with 30–days' prior written notice by the Company only for cause. The term "cause" means (i) the willful and continued failure of Employee substantially to perform his duties with the Company after a demand for substantial performance is communicated to him by the Board of Directors which identifies the manner in which the Board believes he has not substantially performed his duties, (ii) willful misconduct materially and demonstrably injurious to the Company, or (iii) any act of fraud, misappropriation, dishonesty, embezzlement or similar conduct against the Company or any affiliate, or conviction of Employee for a felony or any crime involving moral turpitude (which conviction, due to the passage of time or otherwise, is not subject to further appeal). An act or failure to act by Employee shall be considered willful if such act or failure to act was not in good faith or such act or failure to act was without reasonable belief that it was in the best interests of the Company. Upon termination for cause, Employee shall not be entitled to

any payments or other rights under this Agreement.

(b) If Employee is terminated by the Company for any reason other than cause as defined above, in addition to any other rights and remedies Employee may have under this Agreement or otherwise, all earned and awarded and unvested options to purchase capital stock of the Company then held by Employee shall become immediately vested and exercisable. In addition, the Company shall be obligated to continue to pay Employee's salary as set forth in Section 3(a) above for the remainder of the Employment Period.

(c) Upon termination of Employee's employment for cause, Employee shall resign from the Board of Directors of the Company if he is then a director, and from the Board of Directors of any affiliates of the Company of which he is then a director. Such resignation shall be effective no later than the effective date of termination of his employment.

(d) This Agreement shall terminate upon death of Employee and all payments due under this Agreement shall cease at such time.

Section 5. *Confidentiality and Trade Secrets.* Employee's work for the Company will involve confidential information and/or trade secrets of the Company, including matters of a technical nature such as scientific, trade and engineering secrets, formulae, processes, machines, inventions, and research projects; matters of business nature, such as information about costs, profits, markets, sales, lists of customers and vendors, databases, computer programs, and models; and other information of a similar nature, including plans for future products and services. Employee agrees to keep secret all confidential information and trade secrets of the Company and agrees not to disclose, either directly or indirectly, such information to anyone outside the Company, during or after Employee's employment with the Company except upon written consent of the Board of Directors. Employee shall keep such matters confidential after leaving the employment of the Company, regardless of the reason for the separation of employment.

Section 6. *Agreement Not to Compete.*

(a) Employee covenants and agrees that during his employment with the Company and (a) for a period of two (2) years following the termination of this Agreement if terminated by the Company for cause or if terminated by Employee or (b) for a period of six (6) months following termination of the payment of salary due under Section 4(b) of this Agreement if terminated by the Company other than for cause, or for such foregoing period as applicable following the Company obtaining injunctive relief to prevent Employee's violation of this covenant, Employee shall not, either directly or indirectly, engage in the following activities, or assist others in such activities in any location where the Company conducts its business at the time of the termination of Employee's employment with the Company.

(i) Hiring, recruiting, or attempting to recruit for any person or business entity which is a competitor, or a Related Entity (as hereafter defined) of such competitor, with the Company, any person employed by the Company; or

(ii) Soliciting any business for a competitor, or a Related Entity of such competitor, from any of the Company's current or prospective customers, a prospective customer being defined as any person or entity the Company has actively solicited, planned to solicit (as known to Employee), or provided services to during the twelve (12) months prior to termination of the Employee's employment with the Company.

(b) Employee acknowledges that the Company does business distributing corrupted boxes and packaging products in various locations in the United States and that, with respect to such business, the Company engages in active and substantial competition. For purposes of this Agreement, the term "Related Entity" means any corporation, partnership or other business entity:

(i) controlling, controlled by, or under common control or ownership with a competitor of the Company's business; or

(ii) in which a competitor of the Company's business has substantial equity interest.

(c) Employee will provide the Company with such information as the Company may from time to time request to determine Employee's compliance with the terms of this Agreement. Employee authorizes the Company to contact Employee's future employers and other entities with whom Employee has any sort of business relationship to determine Employee's compliance with this Agreement or to communicate the contents of this Agreement to such employers and entities.

(d) Employee acknowledges that the restrictions set forth in this Section 6 are necessary to prevent the use and disclosure of the Company's confidential information as described in Section 5 and to otherwise protect the legitimate business interests of the Company. Employee further acknowledges that if Employee's employment with the Company terminates for any reason, he will be able to earn a livelihood without violating the foregoing restrictions and that Employee's ability to earn a livelihood without violating such restrictions is a material condition to Employee's employment or continued employment with the Company. Employee agrees that this covenant is reasonable and shall apply both during the term of Employee's employment under this Agreement and thereafter as described above, regardless of how said employment is terminated.

Section 7. *Remedies.*

(a) The Company and Employee agree that irreparable injury would result from any breach by Employee of the provisions in this Agreement, specifically including the Agreement Not To Compete set forth in Section 6, and that monetary damages would not provide adequate relief for any such breach. Accordingly, in addition to other remedies which may be available to the Company, if Employee breaches Section 6 of this Agreement, Employee agrees that injunctive relief in favor of the Company is proper and that an injunction restraining Employee from violating the terms of the Agreement Not To Compete Section will not be contrary to the public health, safety or welfare. Further, Employee acknowledges that the covenants contained in the Agreement Not To Compete Section are reasonable, and Employee agrees that neither he nor any other person on his behalf shall contest any injunctive relief sought or obtained by the Company to enforce such covenants.

(b) If a court of competent jurisdiction determines that any of the restrictions in this Agreement are overbroad or unreasonable, Employee agrees to modification of the affected restriction(s) to permit enforcement to the maximum extent allowed by law.

(c) With the exception of the availability of injunctive relief with respect to the Agreement Not to Compete set forth in Section 6, in the event that the parties are unable to resolve a dispute, including but not limited to a dispute relating to a conflict-of-interest issue, both parties agree to binding arbitration to resolve the dispute, with each party designating one arbitrator and the two designated arbitrators choosing a neutral third arbitrator whose name appears on the list of neutral arbitrators maintained by the American Arbitration Association. Each party shall designate its arbitrator within twenty (20) days of written notice being given by either party and the third arbitrator shall be designated within ten (10) days of the designation of the two parties' arbitrators. If feasible, the arbitration shall be completed within thirty (30) days of designation of the arbitrators. Arbitration fees shall be paid jointly by the parties. If a party fails to comply with provisions of this paragraph, the other party may seek and obtain injunctive relief or any appropriate decree of specific performance against the breach of this paragraph, and the party which failed to comply with the paragraph shall reimburse the other party for any costs associated with enforcing this paragraph.

Section 8. *Notices.* Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and personally delivered by hand or sent by registered or certified mail, if to Employee, to him at the last address he has filed in writing with the Company or, if to the

Company, to its corporate secretary at its principal executive offices.

Section 9. *Non–Alienation.* Employee shall not have any right to pledge, hypothecate, anticipate, or in any way create a lien upon any amounts provided under this Agreement, and no payments or benefits due hereunder shall be assignable in anticipation of payment either by voluntary or involuntary acts or by operation of law. So long as Employee lives, no person, other than the parties hereto, shall have any rights under or interest in this Agreement or the subject matter hereof.

Section 10. *Entire Agreement; Amendment.* This Agreement constitutes the entire agreement of the parties in respect to the subject matter hereof. No provision of this Agreement may be amended, waived or discharged except by the mutual written agreement of the parties. The consent of any other person to any such amendment, waiver or discharge shall not be required.

Section 11. *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of the Company, its successors or assigns, by operation of law or otherwise, including without limitation any corporation or other entity or person which shall succeed (whether directly or indirectly, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business and/or assets of the Company. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of Employee and his legal representatives, heirs, and assigns.

Section 12. *Withholding of Taxes.* The Company may withhold from any benefits payable under this Agreement all federal, state, city or other taxes as shall be required pursuant to any law or governmental regulation or ruling.

Section 13. *Governing Law.* The validity, interpretation, and enforcement of this Agreement shall be governed by the laws of the State of Florida.

Section 14. *Severability.* In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect.

Section 15. *Miscellaneous.* This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together constitute one and the same instrument. The parties have read and fully understand the meaning of this Agreement, have had an opportunity to consider its provisions, and are in full agreement with all of the provisions.

**IN WITNESS WHEREOF,** Employee has hereunto set his hand and, pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf, and its corporate seal to be hereunto affixed and attested by its Secretary or Assistant Secretary, all as of the day and year first shown above written.

ATTEST:

By: _____

JOTAN, INC.

By: _____

_____
Employee

Exhibit 2

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is hereby entered into this 18 day of April, 1997, between Jotan, Inc., a Florida corporation ("Employer" or "Company"), and Jeff Barnett, an individual residing in 10150 Belle Rue, Unit 1006 32256 ("Employee").

### WITNESSETH:

Employer wishes to obtain or keep the services of Employee and Employee wishes to be employed by Employer upon the terms and conditions set forth herein.

Now, therefore, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Employment. Employer hereby agrees to employ or continue to employ Employee and Employee agrees to serve Employer as an employee for the term of this Agreement and upon the terms and conditions herein set forth.

2. Responsibilities. During the term of this Agreement Employee shall serve as a National Sales Rep. for the Employer's Jacksonville location or in such other position as Employer's Board of Directors or its designee shall determine. Employee shall be responsible for Sales and/or such other matters as the Board of Directors or its designee may from time to time determine and Employee's services shall be subject to the direction of such Board of Directors and its designee(s).

Employee will devote Employee's full working time, attention and energy to the affairs of Employer or its subsidiaries, as directed by Employer's Board of Directors or its designee. (As used herein, the term "subsidiary" shall mean any company 51% or more of whose outstanding stock is owned by another company and "wholly-owned subsidiary" shall mean any company 80% or more of whose outstanding stock is owned by another company.) Employee shall diligently and to the best of Employee's ability perform all duties incident to Employee's employment hereunder. Employee shall use Employee's best efforts to promote the interests of Employer.

3. Compensation. As compensation for Employee's services during the term of this Agreement, Employer shall pay Employee in accordance with the schedule attached hereto as Exhibit "A" and incorporated herein by reference.

4. Term. This Agreement shall be effective as of April 28, 1997. Subject to the provisions for termination as set forth in Section 5, the term of this Agreement shall be for 3 years; provided, that the term of this Agreement shall be automatically extended for successive one year terms thereafter so long as neither party hereto has given the other written notice of termination at least sixty days prior to the end of the original term or the end of any subsequent one-year term.

5. Termination. In addition to termination pursuant to the provision of Section 4, this Agreement will terminate (a) upon the death of Employee, (b) upon written notice of termination from Employer after Employee has been unable, due to a disability, to perform the essential functions of his position, with or without reasonable accommodation, for at least ninety (90) days in any twelve (12) month period, (c) upon ninety (90) days written notice by Employer that it is terminating Employee without cause, or (d) upon thirty (30) days written notice by Employer that it is terminating Employee for Cause.

5.1 "Cause," as used in this Section, shall be defined to include the following:

(a) Employee commits or is convicted of a felonious offense or a crime involving moral turpitude; or

(b) Employee has dishonestly dealt with the assets or business of Employer; or

(c) Employee has misappropriated or disclosed to others in competition with Employer any confidential information of Employer, including trade secrets, customer lists, plans, or other intellectual property interest of Employer; or

(d) Employee has used illegal drugs, has abused prescription drugs, has been intoxicated by alcohol or drugs while working or representing Employer or

has been guilty of gross negligence or misconduct in the execution of his duties for Employer; or

(e) Employee fails to abide by reasonable rules of conduct or policies promulgated by Employer governing conduct of its Employees or Employee engages in any activity or business relationship that conflicts with any interest of Employer; or

(f) Employee has breached the terms of this Agreement or has otherwise materially failed to perform his obligations hereunder, including, where appropriate, Employee's failure to meet minimum sales levels required by Employer.

5.2 If Employee is terminated with Cause, Employer shall be required to pay only Employee's compensation through the effective date of termination and Employer shall be entitled to relieve Employee of Employee's duties during any notice period prior to the effective date of termination.

5.3 Employee may resign Employee's employment hereunder upon ninety (90) days written notice of his intent to resign; provided, however, that Employee agrees to remain employed pursuant to the terms of this Agreement for an additional period of up to ninety (90) days after the initial notice period at the request of Employer if Employer makes such request more than ten (10) days prior to the end of the initial notice period. If Employee resigns, Employer shall be entitled to relieve Employee of Employee's duties during any portion, or all, of the notice period.

6. Non–Competition.

6.1 The parties acknowledge:

(a) that Employee's services under this Agreement will require special expertise and talent in the Business Activities (as defined below) and that Employee has developed or will develop substantial contacts with suppliers and customers of Employer and its subsidiaries;

(b) that Employee will be well-compensated under this Agreement for the expertise, knowledge and contacts Employee has obtained and will obtain;

(c) that pursuant to this Agreement, Employee will be placed in a position of trust and responsibility and he will have access to a substantial amount of Confidential Information and Trade Secrets and that Employer is placing Employee in such position and giving Employee access to such information in reliance upon Employee's not competing against Employer or its subsidiaries, and not soliciting Employer's or its subsidiaries' customers during the time periods set forth in this Agreement;

(d) that due to Employee's special experience and talent, the loss of Employee's services to Company under this Agreement cannot reasonably or adequately be compensated solely by damages in an action at law;

(e) that Employee is or will be capable of competing with and substantially harming Employer and its subsidiaries and has or will have more than adequate experience, customer contact, supplier contact, name recognition and industry reputation to start and/or sustain a competing business; and

(f) that the terms of this Section 6 are necessary to protect Employer's legitimate business interests and confidential information and that Employee's competition with Employer or its subsidiaries or other violation of the covenants set forth below would cause substantial and irreparable harm to Employer.

6.2 For purposes of this Agreement, "Trade Secrets" shall mean all secret, proprietary or confidential information regarding Employer or its business, whether developed by Employee or otherwise, including any and all information not generally known to, or ascertainable by, persons not employed by Employer, the disclosure or knowledge of which would permit those persons to derive actual or potential economic value therefrom or to cause economic or financial harm to Employer. "Trade Secrets" shall not include information that has become generally available to the public by the act of one who has the right to

disclose such information without violating a legal right of Employer.

6.3 For purposes of this Agreement, "Confidential Information" means information, other than Trade Secrets, which relates to Employer, Employer's business, or Employer's suppliers or customers that is not generally known by persons not employed by Employer and which Employee has learned as a consequence of Employee's relationship to Employer. Such information includes, without limitation, financial information, strategic plans and forecasts, marketing plans and forecasts, customer lists, customer pricing and order data, supplier lists, or technical information relating to Employer's products or services. Confidential Information shall not include information which has become generally available to the public by the act of one who has the right to disclose such information without violating a legal right of Employer.

6.4 During the time that Employee is an employee of Employer, and for a period of one (1) year thereafter (regardless of whether Employee's employment terminates voluntarily or involuntarily or with or without cause), Employee shall not, directly or indirectly, seek or obtain a "Competitive Position" in the "Territory" with a "Competitor" of Employer. For purposes of this Agreement, a "Competitor" of Employer is any entity, individual, partnership, joint venture, association, firm or corporation engaged, wholly or in part, in "Business Activities"; a "Competitive Position" is any employment with a "Competitor" of Employer in which Employee will use or is likely to use any Confidential Information or Trade Secrets (as those terms are defined above in this Agreement), or in which Employee has duties for such "Competitor" of Employer that relate to "Business Activities" and that are the same or similar to those actually performed by Employee for Employer; "Business Activities" shall mean the wholesale distribution and sale of packing boxes, bags and other packaging materials for the moving and storage industry, the air freight industry and the perishables transportation industry; and "Territory" shall mean the geographic area consisting of the territory within two hundred and fifty (250) miles of each of the distribution centers operated by Employer in the following locations: All Jotan and Southland locations. Employee acknowledges and agrees that the foregoing Territory is reasonable because Employee has performed and/or will perform substantial work in connection with sales made, and Confidential Information and Trade Secrets relating to, all of the listed locations and the areas surrounding them. The parties agree to review and revise (by a written amendment to this Agreement) the geographic area included within the Territory, the definition of Business Activities and/or the definition of Competitive Position at either party's request upon any material change in the Territory, the Business activities or Employee's duties in order that the definitions of the Territory, the Business Activities and Competitive Position may be reformed so that their coverage extends to, but only to, the geographic area and the types of business and employee duties actually within the scope of Employee's responsibilities and experience with Employer and actually necessary to protect the legitimate interests of Employer. No such reformation is valid unless it is evidenced by written amendment to this Agreement and signed by both parties.

6.5 Notwithstanding anything contained herein, Employee may own up to 5% of the shares of a publicly-held corporation which competes with Employer or its subsidiaries, provided that none of Employee's other relationships with such corporation violate the terms of this Section 6.

6.6 During the Term of this Agreement and for two (2) years thereafter, Employee shall not, on Employee's behalf or on behalf of others, use or disclose any Confidential Information or Trade Secrets except in the furtherance of the business of Employer. Trade Secrets shall not lose the protection of this provision at the end of the two-year period. Employee shall not use or disclose any Trade Secret at any time while the information remains a

Trade Secret. Nothing in this provision shall limit the protections available to Employer under any federal, state or local statute or legal principle governing confidential information or trade secrets.

6.7 All records, files, software, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, technical information, information on the use, development and integration of Employer products or materials, and the like (together with all copies of such documents and things) relating to the business of Employer, including any and all Trade Secrets and Confidential Information, which Employee shall use or prepare or come in contact with in the course of, or as a result of, his employment shall, as between the parties to this Agreement, remain the sole property of Employer and Employee hereby conveys such property to Employer. Employee agrees that he shall return to Employer all such information and materials, including all copies thereof, immediately upon the termination of his employment with Employer and, at the request of Employer, he shall cooperate with Employer to assign such information and materials to Employer and/or to register or obtain patent, trademark, service mark or copyright protection in favor of Employer with respect to all such information and materials.

6.8 Notwithstanding anything else in this Agreement, the terms of this Section 6 shall survive the expiration or termination of Employee's employment or of this Agreement. In addition to any other remedies available to Employer, if Employee violates any portion of this Section 6, he shall forfeit and return all severance due to him, or already paid to him pursuant to this Agreement or any other agreement.

Employee acknowledges that this agreement not to compete with Employer and its subsidiaries is necessarily of a special, unique and extraordinary nature, and that the loss arising from a breach thereof cannot reasonably be compensated by money damages and will cause Employer and its subsidiaries irreparable harm. Accordingly, upon the failure of Employee to comply with the terms of this Section 6 at any time, Employer and its subsidiaries shall be entitled to injunctive and other extraordinary relief in case of such breach, such injunctive or other extraordinary relief to be cumulative to, but not in limitation of, any other remedies to which Employer or its subsidiaries may be entitled.

Employer and Employee intend that Employer have the broadest possible protection from unfair competition by Employee with Employer and its subsidiaries, consistent with public policy. Accordingly, should any court of competent jurisdiction determine that, consistent with the established precedent of the forum state, the public policy of such state requires a more limited restriction in duration, geographic area, nature of restricted activity, or any combination thereof, it would be in furtherance of the intentions of the parties hereto for the court to so interpret and construe the terms of this Agreement to apply to only such more limited restrictions to an appropriate degree.

7. Transfer. This Agreement and all rights and obligations hereunder are personal to Employer and may not be assigned, transferred, alienated or hypothecated by Employee without the express written consent of the Employer.

8. Miscellaneous.

8.1 Amendment. This Agreement shall not be amended except by a written agreement signed and delivered by the parties hereto.

8.2 Governing Law. The interpretation and construction of this Agreement shall be governed by the laws of the State of Florida.

8.3 Notices. All notices and communications given pursuant hereto shall be in writing and shall be deemed to have been duly given if mailed by registered mail, return receipt requested:

    (a) If to Employer:
        Jotan, Inc.
        118 West Adams St.
        Jacksonville, Florida 32202
        Attention: President

    (b) If to Employee:
        Jeff Barnett

10150 Belle Ave. Unit 1001

Jacksonville, Fla. 32256

Either party may change the address to which such notices and communications shall be sent by written notice to the other party.

8.4 Scope. This Agreement constitutes the entire understanding of Employee with respect to Employer and supersedes all agreements or understandings previously made between the parties hereto relating to this subject matter.

8.5 Gender. Pronouns of any gender used herein shall include the other gender and the neuter, and the singular and the plural shall each include the other.

IN WITNESS WHEREOF, the parties hereby have executed this Agreement as to the day and year first above written.

**EMPLOYER:**

**JOTAN, INC.**

BY:

Title: U.P. & C.F.O.

**EMPLOYEE:**

Exhibit A

Jotan, Inc.

Employment Agreement

Jeff Barnett

Monthly Base Draw     $6,500

Employee will be paid on a commission basis equal to 10% of gross margin. When his commission exceeds $6,500 per month for three consecutive months, employee's compensation changes to straight commission.

If employee brings in more than $2.5 million of new business in any calendar year he will be entitled to a bonus of 1% of sales on that new business. Only business signed after employment date. qualifies for bonus. If employee jointly develops new business with other company employees, credit for the business will be split between those employees developing and servicing the account.

Employee will be eligible for stock options under the stock option plan as well as participation in the Company 401(k) plan.