In re INTEGRATED HEALTH
SERVICES, INC., et al.,
Debtors.

Rotech Memorial Hospital, East Tennessee Infusion and Respiratory Inc., d/b/a Fox Home Medical, Plaintiff,

v.

Blount Memorial Hospital Joseph Fox, Jill Fox, Stacy Fox, Stephen Cox, Donald Talley, Stephanie Redwine, Sue McMurray, Katrina Springs, Jon Miller, Matthew Jenkins and Those Unknown in Concert with the Defendants, Defendants.

Bankruptcy Nos. 00–389 (MFW)
through 00–826 (MFW).
Adversary No. 00–1145 (MFW).

United States Bankruptcy Court,
D. Delaware.

Nov. 9, 2000.

Order modifying opinion Jan. 5, 2001.

James A. Patton, Robert S. Brady, Joel A. Waite, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Michael J. Crames, Arthur Steinberg, Marc D. Rosenberg, Kaye Scholer Fierman Hays & Handler, LLP, New York City, for Integrated Health Services, Inc., et al.

Joanne B. Wills, Steven K. Kortanek, Maria Aprile Sawczuk, Klehr Harrison Harvey Branzburg & Ellers LLP, Wilmington, DE, Glenn Rice, William Silverman, Otterbourg Steindler Houston & Rosen, PC, New York City, for the Official Committee of Unsecured Creditors.

Charles P. Greenman, Stephen G. Rinehart, Parker Chapin, LLP, New York City, Celeste Jones, A. Victor Rawl, McNair Law Firm, P.A., Columbia, SC, for Rotech.

Donald Detweiler, Welch & White, P.A., Wilmington, DE, David R. Duggan, Garner & Duggan, Maryville, TN, for Joseph Fox.

Ralph Brown, Ralph Brown & Associates, Cedar Bluff Office Park, Knoxville, TN, for Stacy Fox, Stephen Cox, Donald Talley, Stephanie Redwine, Sue McMurray, Katrina Springs, Jon Shannon Miller & Matthew Jenkin.

Michael DeBaecke, Blank Rome Comisky & McCauley, Wilmington, DE, Carl P. McDonald, Goddard & Gamble, Maryville, TN, John A. Walker, Jr., Walker & Walker, P.C., Knoxville, TN, for Blount Memorial Hospital.

Daniel K. Astin, Maria Giannarakis, Office of the United States Trustee, Philadelphia, PA.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of Ro-Tech Medical Corp. and its subsidiaries ("the Debtors"): 1) to enjoin the Defendants from directly or indirectly, concealing, removing or destroying any of the Debtors' property; 2) to direct the Defendants to turnover all of the Debtors' property in their possession; 3) to enjoin the Defendants from employing or recruiting any of the Debtors' employees or former employees; 4) to enjoin the Defendants from competing with the Debtors by soliciting any of the Debtors' business from any patients, physicians, or other referral sources; 5) to enjoin the Defendants from making any statements regarding the Debtors' patients, financial condition or reorganization prospects; 6) to enjoin the Defendants from using or disclosing any of the Debtors' confidential information or trade secrets; 7) to enjoin the Defendants from competing with the Debtors through another business entity or using any trade name similar to "Fox Home Medical" for any purpose; and 8) to enjoin Fox from denying the Debtors access to their office.

After hearing testimony and considering the parties' post-trial briefs, we find that there is ample reason to grant, in part, the Debtors' Motion.

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A) and (O).

## II. *FACTUAL BACKGROUND*

1. From 1986 to 1995, Joseph Fox ("Fox") was the owner and officer of Fox Home Medical ("Home Medical"), a medical service provider whose services included home respiratory care and home infusion care in the Maryville, Tennessee area. The most lucrative of Home Medical's services is supplying oxygen to its customers.

2. Fox was also a part-owner of the real estate where Home Medical was located.

3. In August, 1995, the Debtors purchased Home Medical from Fox. Since that time, the Debtors have continued doing business under the Home Medical name from that location.

4. After the sale, Fox and his partners retained the real estate, which was leased to the Debtors for five years. Fox was employed by the Debtors as the manager of the Home Medical office.

5. At the time of the sale, Fox executed a Non–Compete Agreement which provided that, for five years, Fox "would not, directly or indirectly, own manage, operate, join, control or participate in the ownership, management, operation or control, of or be connected with in any manner, any home care business within the city limits of or within fifty ... miles of Maryville, Tennessee." At the same time, Fox signed an Employment Agreement which, *inter alia*, extended the Non–Compete Agreement for 36 months after the termination or expiration of Fox's employment with Home Medical.

6. After the Debtors purchased Home Medical, they delivered employee handbooks to all of their employees. The handbook includes three sections which are relevant to the case *sub judice*. Section 104 titled "Conflicts of Interest" provides that "Employees have an obligation to conduct business within guidelines which prohibit actual or potential conflicts of interest." Section 105 titled "Outside Employment" provides that "An employee may hold a job with another organization, other than competitors ...." Section 106 titled "Non–Disclosure" provides that confidential business information may not be disclosed by employees, including billing or financial information, patient lists, patient information, or referral sources. Section 106 provides that if any employee improperly discloses such information, he is subject to disciplinary action, including termination.

7. Fox was responsible for making sure that each employee returned a signed form acknowledging that he had read and understood the handbook. Each of the named employee-defendants signed a form which indicated that he or she had read the handbook. At least one other Home Medical employee, Sue McMurray, signed a non-compete agreement with the Debtors after their purchase of Home Medical.

8. Between 1995 and 1999, Fox also worked as a consultant for other companies in the health care and other industries. Fox asserts that he began to work as a consultant only after receiving permission from the Debtors. Fox continued to work for Home Medical full time. Prior to 1999, his consulting services did not involve competitors of the Debtors.

9. In 1999, Blount Memorial Hospital ("Blount"), a state hospital formed by an act of the Tennessee legislature, began considering entering the durable medical equipment business ("the DME business") in Maryville, Tennessee. Blount met with Fox for the purpose of hiring him as a consultant to assist them with their entry into the

DME market. Fox informed Blount that he acted as a consultant for the Van Fleet Group and recommended that Blount retain Van Fleet as consultants.

10. In accordance with Fox's instructions, Blount retained Van Fleet as consultants, and Van Fleet turned the matter over to Fox. Fox and Van Fleet agreed that Fox would receive two-thirds of all fees paid by Blount.

11. Blount was aware that Fox was an employee of the Debtors and the manager at Home Medical, which was in the DME business.

12. As part of his consulting work for the Van Fleet Group, Fox outlined three options for Blount's strategic plan to enter the DME business in the area. Those options included acquiring an existing operation, developing its own home medical operation, or maintaining its present mode of operation through referrals to companies such as Home Medical. Fox recommended acquiring an existing operation, specifically, the purchase or take-over of Home Medical. Among the reasons cited in his February 29, 2000, memorandum, was that "if [Blount] can acquire [Home Medical] for less than $500,000.00 it should be able to recoup its investment in two years based on [Home Medical's] 1999 net income." In his memo to Blount, Fox used the Debtors' confidential financial information.

13. About this same time, the Debtors filed voluntary Chapter 11 petitions on February 2, 2000.

14. On August 22, 2000, Fox, who was still employed by the Debtors, met with all of the employees of Home Medical and informed them that Blount's Board of Directors had approved its entry into the DME business. Fox informed the employees that they needed to decide if they wanted to go with Blount's new operations or stay with Home Medical. If they wanted to go to Blount, Fox assured them that Blount would be willing to employ them. Fox also told them that the Debtors' lease was set to expire at the end of August and that Blount would be moving into the same location. Fox helped the employees make their decision by assisting them with a "pro/con list."

15. After the discussion among the employees, Fox gave Sue McMurray, one of the long time employees at Home Medical, a package describing the benefits offered by Blount. Soon afterward, the employees selected McMurray to meet with Blount regarding employment and benefits. Between August 22 and September 1, McMurray met with Don Heineman, an associate administrator of Blount. Blount offered all Home Medical employees jobs at the same salaries they had been making, with slightly better benefits.

16. On August 30, 2000, Fox wrote a letter to the Debtors' customers stated that Blount was about to commence DME operations. The letter further stated that Blount had hired all of the Debtors' Maryville employees and would commence operations on September 16, 2000, at the Home Medical location. The letter gave customers three options: 1) they could remain with the Debtors and be serviced by the Debtors' locations outside the area; 2) they could transfer to Blount and be serviced by the same people at the same location; or 3) they could transfer to any other medical supplier in the area. If a customer chose the second or third option, he would have to fill out a transfer consent form.

17. That same day, Fox instructed some of the Debtors' employees to go to the customers' homes and give each customer a copy of the letter and an attached transfer consent form. Fox told those employees to explain to

customers that, after the employees moved to Blount, they would not be able to service the customer unless they switched to Blount.

18. Because the nature of the DME business is built upon the relationships between the care providers and the customers, Fox expected that most, if not all, of Home Medical's customers would transfer to Blount if the employees moved to Blount.

19. On September 1, 2000, Blount issued a press release stating that Blount would enter the DME business on September 18, 2000. The press release stated that Blount was hiring all the Home Medical employees and that its DME business would operate at Home Medical's location. The release also quoted Fox, identified as a consultant to Blount, stating that the transition from Home Medical to Blount was expected to be "a seamless continuation of operations."

20. On September 1, 2000, all of the employees advised Home Medical that they were resigning effective September 15, 2000. At least one employee, Stephen Cox, accepted the Blount offer by notifying Fox, who notified Blount.

21. Between August 31 and September 13, 2000, the Debtors' employees delivered the letters to the Debtors' customers. In many cases, the employees explained the letter, as instructed by Fox. The employees also filled out transfer consent forms for customers where they were physically unable to do so themselves. Over one hundred and eighty of the Debtors' customers chose to transfer from the Debtors to Blount.[2]

22. The Debtors' employees gave the transfer consent forms to Fox, who gave them to Rick Carver, the Blount manager of the DME facility. Car-

ver held the forms for two days, but then returned them to Fox because Blount did not want to possess them before opening its DME facility.

23. On September 15, 2000, the Debtors filed this adversary proceeding against Fox, Blount, and the Debtors' employees (collectively, "the Defendants"). In their complaint, the Debtors allege that Fox breached his fiduciary duty to the Debtors and, as owner of the real estate where the Debtors conduct their business, has also unlawfully threatened to dispossess the Debtors. The Debtors assert that Fox and the other employees have illegally transferred confidential files, patient and referral lists, and other confidential information to a competitor, Blount. The Debtors also allege that Blount unlawfully conspired to compete with the Debtors by, *inter alia*, systematically hiring all of the Debtors' employees and using those employees, while they were still employed by the Debtors, to solicit the Debtors' customers on behalf of Blount. The Debtors assert that the Defendants' conduct has threatened the Debtors' continuing relations with their patients and referring physicians.

24. On September 18 and 26, 2000, after hearing evidence presented by the Debtors and Defendants, we granted the Debtors' Motion for a Preliminary Injunction against all of the Defendants until October 30, 2000, pending a written decision on the Motion. In the interim, the parties briefed the issues raised by the Motion. The injunction was extended to November 9, 2000, by Order dated October 26, 2000.

25. In the interim, the Debtors agreed to continue to employ all the Home Medical employees except Fox and

---

**2.** While it is unclear how many oxygen clients the Debtors had, the evidence suggests that Fox was successful in getting the majority of those clients solicited by the employees to agree to transfer to Blount.

his wife, Jill Fox. The Debtors agreed that Jill Fox could be employed by Blount as a nurse so long as she did not work in the DME business.

## III. DISCUSSION

■■■ In considering whether to grant a preliminary injunction, courts consider four factors:

1) the likelihood that the plaintiff will prevail on the merits at final hearing;

2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of;

3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is granted; and

4) the public interest.

*The Pitt News v. Fisher,* 215 F.3d 354, 365–66 (3d Cir.2000); *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1438 (3d Cir.1994); *Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.,* 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 191–92 (3d Cir.1990). The court should issue the injunction only if the plaintiff produces evidence that all four factors favor granting the injunction. *Pitt News,* 215 F.3d at 365; *Duraco,* 40 F.3d at 1438; *Merchant & Evans,* 963 F.2d at 632–33; *ECRI v. McGraw-Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987).

### A. The Debtors Are Likely To Succeed On The Merits

#### 1. Joseph Fox

■■■ The Debtors have presented sufficient evidence to establish they are likely to succeed on the merits of their action against Joseph Fox. Fox, as the manager of Home Medical, had a duty of loyalty to his employer. *See* Restatement (Third) of Agency § 1.01 (2000). Tennessee law requires an officer to discharge his duties in good faith, with the care which an ordinarily prudent person in a like position would

exercise under similar circumstances and in a manner the officer reasonably believes to be in the best interests of the corporation. *See* Tenn.Code Ann. § 48–58–403(a) (1999). Therefore, even without a separate agreement which prohibits working for competitors, a senior employee such as Fox has a duty of loyalty which precludes him from soliciting the Debtors' employees and customers on behalf of a competitor while employed by the Debtors. *See B & L Corp. v. Thomas & Thorngren, Inc.,* 917 S.W.2d 674, 679 (Tenn.Ct.App.1995) (prior to termination, an officer may not solicit the company's customers or employees).

Additionally, Fox's duty of loyalty precludes him from accepting any position in actual conflict with the interests of the corporation. *See Hayes v. Schweikart's Upholstering Co.,* 55 Tenn.App. 442, 402 S.W.2d 472, 483 (Tenn.Ct.App.1985). Fox's duty of loyalty also prohibits him from disclosing confidential information, such as a customer list or financial information, to a competitor of the Debtors. Finally, even if Fox had permission to act as a consultant, he could not undertake to instruct a direct competitor on how to take over the Debtors' market share, thereby putting his own employer at risk.

At the very minimum, Fox's conduct in this case was a violation of his duty of loyalty and fiduciary duty. The fact that he was bound by a covenant not to compete makes his violations all the more egregious.

Fox asserts that he is not liable under Tennessee law, citing two cases to support his position: *Data Processing Equip. Corp. v. Martin,* No. 87–230–II, 1987 WL 30155 (Tenn.Ct.App. Dec. 30, 1987), and *Venture Express, Inc. v. Zilly,* 973 S.W.2d 602 (Tenn.Ct.App.1998). After reviewing those cases we find that neither supports Fox's position. On the contrary, they support the Debtors' argument.

In *Data Processing,* the Court held that the Defendants could not be held liable for successfully soliciting the Plaintiff's

customers after they had left their employ because the customer list was not secret and an employee's personality which fosters good relations with customers is not a "trade secret" protectable without a covenant not to compete. *Id.* at \*3–6. The *Data Processing* case is distinguishable from this case because, in that case, the Defendants had left the Plaintiff's employ before they solicited the Plaintiff's customers. In this case, Fox was still working for the Debtors when he solicited the Debtors' customers and employees for Blount. Those actions were a flagrant violation of his fiduciary duty and duty of loyalty. Moreover, in the *Data Processing* case, the Defendants had not signed a covenant not to compete. The *Data Processing* Court stated that "if [the Plaintiff] had required as a condition of employment that [the Defendants] execute a covenant not to compete which was reasonable in time and space, it would have been enforceable ...." *Id.* at \*6. In this case, Fox did sign a non-compete which precludes him from competing with the Debtors for three years after leaving their employ. Thus, the holding in *Data Processing* is inapplicable.

The *Zilly* case similarly does not support Fox's position. In *Zilly*, the Defendant had received a negative performance review. 973 S.W.2d at 603. In anticipation of being terminated, the Defendant formed a new company. After learning about the new company, the Plaintiff fired the Defendant. Thereafter, the Defendant began soliciting clients on behalf of his own company, including some of the Plaintiff's clients. The Plaintiff commenced suit alleging that the Defendant had violated his fiduciary duty to the Plaintiff, usurped the Plaintiff's corporate opportunities, and had used the Plaintiff's confidential business information (the Plaintiff's customer list). *Id.* The *Zilly* Court held that the Defendant was not liable because he waited until *after* he had left his employment before acting against his employer's interest. In this case, Fox did not. All of the actions of Fox, including soliciting the Debtors'

employees and customers for Blount, occurred while Fox was still employed by the Debtors.

 Fox also asserts that *Zilly* supports his position that Home Medical's financial information and customer lists are not a trade secret because they are public knowledge, generally known within the industry, or ideas which are easily ascertainable. 973 S.W.2d at 606. We disagree. In deciding what is a trade secret under Tennessee law, courts look at a number of factors, including:

1) the extent to which the information is known outside the business;

2) the extent to which it is known by employees and others involved in the business;

3) the extent of measures taken by the business to guard the secrecy of the information;

4) the value of the information to the company and its competitors;

5) the amount of money or effort expended by the company to develop the information; and

6) the ease or difficulty which would be required to acquire or duplicate the information.

*Zilly*, 973 S.W.2d at 607; *Stangenberg v. Allied Distrib. and Bldg. Serv. Co.*, No. 86–12–II, 1986 WL 7618, at \*6 (Tenn.App. Ct. July 9, 1986). Applying this six-factor test, we conclude that the Debtors' financial information and customer lists are confidential trade secrets.

The Debtors' financial information is clearly not known outside the business. While the costs of certain products and the amount of reimbursable costs may be ascertainable, the Debtors' fixed costs and profitability are not widely known or public knowledge. Additionally, there is no evidence that any of the Debtors' rank-and-file employees had knowledge about the Debtors' financial information. That information clearly has value, both to the Debtors, and to their competitors. Ac-

cordingly, we conclude that the Debtors' financial information is confidential.

We find that the Debtors' customer lists are not public knowledge, either. While Home Medical may receive up to 80% of its referrals from Blount,[3] the other 20% clearly were not known by anyone other than Home Medical. Despite the fact that Home Medical receives a large percentage of its referrals from Blount, it took Home Medical a long time to build up its customer lists. Thus, although Blount may be able to replicate that list or build up its own list from customers it would otherwise refer to the Debtors, that would take enormous effort and an extended period of time. Obviously the Debtors' lists (in their existing format) have a great deal of value to the Debtors. Consequently, we hold that the customer lists are protectable confidential information.

Finally, Fox asserts that an employee's general knowledge and skill are not a trade secret. *See Hickory Specialties v. B & L Labs., Inc.*, 592 S.W.2d 583 (Tenn.Ct. App.1979). As discussed above, the information which is at issue is not general knowledge, but rather is confidential information. Furthermore, Fox signed an agreement which barred him from disclosing this information. He is bound by that agreement.

We therefore find that it is likely that, at final hearing, the Debtors will prevail on the merits against Fox for breach of his fiduciary duty and breach of contract.[4]

## 2. *Blount Memorial Hospital*

Blount maintains that it did nothing wrong. Specifically, it asserts that it did not enter into any lease for the Debtors'

premises and that it is not in possession of any patient lists, transfer agreements or any other property of the Debtors. Blount also asserts that it did not unlawfully conspire with Fox or the Employees.

██ While we agree that Blount's conduct was less egregious than that of Fox, we conclude that the Debtors have presented sufficient evidence that Blount tortiously interfered with the Debtors' business relations to conclude that the Debtors are likely to succeed on the merits of their action against Blount. Under Tennessee law, inducing a party to breach a contract is unlawful. Therefore, we find that Blount did unlawfully conspire with Fox to solicit the Debtors' employees and customers. Accordingly, we will grant the Motion for a preliminary injunction and enjoin Blount from employing the former Home Medical Employees or soliciting the Debtors' customers.[5]

██ Under Tennessee law, in order to establish a cause of action for conspiracy to induce a breach of contract, the plaintiff must prove seven elements:

(1) that there was a legal contract;

(2) that the wrongdoer had sufficient knowledge of the contract;

(3) that the wrongdoer intended to induce its breach;

(4) that the wrongdoer acted maliciously;

(5) that the contract was breached;

(6) that the act complained of was the proximate cause of the breach; and

(7) that damages resulted from the breach.

*AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379, 388 (M.D.Tenn.1993); *TSC*

---

**3.** It is unclear what percentage of Home Medical's referrals are from Blount. For the sake of argument we will assume that 80%, the highest percentage cited by either party, is the correct amount.

**4.** We make no findings as to any other cause of action commenced by the Debtors against Fox, because they are unnecessary to grant the Debtors' preliminary injunction.

**5.** As noted above, Blount hired one of the Debtors' former employees, Jill Fox, a nurse, conditioned upon her not working in the DME business. The Debtors did not object to that employment. Therefore, we will not enter an injunction precluding that employment.

*Indus., Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). For the following reasons, we find that the Debtor has presented sufficient evidence of all seven elements to support concluding that it is likely to succeed in establishing that Blount tortiously interfered with the Debtors' business relations.

As noted above, Fox was the manager of Home Medical. He also had a non-compete agreement, and the Debtor has presented substantial evidence that Fox breached that contract. Even if Blount did not know about Fox's non-compete agreement, Blount knew that Fox's disclosure to it of confidential information was a breach of his fiduciary duty to the Debtors. After receiving Fox's first report (in which he revealed financial information about the Debtors and recommended taking over Home Medical—a clear breach of his fiduciary duty to Home Medical), Blount continued to employ Fox for the purpose of pursuing its efforts to start a DME business in direct competition with the Debtors. Finally, though they returned them two days later, Blount received the patient transfer consents from Fox, which revealed confidential information about the Debtors' business and customers. We therefore find that there was sufficient evidence presented to establish that there was a contract, the wrongdoer had sufficient knowledge of the contract, and the contract was breached.

Despite its knowledge that Fox was the manager of Home Medical, and its likely knowledge that Fox was party to a non-compete agreement, Blount hired Fox to advise it how to compete with his employer. We, therefore, conclude that the Debtors have presented sufficient evidence that Blount was the proximate cause of Fox's breach.

■ We find that the fourth element is also satisfied. Under Tennessee law, malice does not require ill-will or spite, but may be demonstrated "simply by conduct that it is 'the violation of a known right.'" *AmeriGas,* 844 F.Supp. at 389 (*quoting In*

*re AM Int'l,* 46 B.R. 566, 575 (Bankr. M.D.Tenn.1985)). As stated above, it is likely that Blount knew about Fox's non-compete agreement with the Debtors. Blount clearly knew that Fox was the manager of Home Medical and owed a fiduciary duty of loyalty to the Debtors. Therefore, the evidence presented is sufficient to conclude that the Debtors are likely to succeed in establishing the malice element.

Finally, we conclude that damages have resulted from the breach. The financial information and customer lists have already been disclosed to Blount. As a result of Fox's breach of loyalty, which Blount induced, the Debtors' business is in upheaval.

We find two cases analogous to this case: *AmeriGas,* and *Jotan, Inc. v. Barnett (In re Jotan* ), 229 B.R. 218 (Bankr. M.D.Fla.1998). In *AmeriGas,* the Plaintiff sued two former employees (who were subject to a valid non-compete agreement) and their new employer, Empire Gas. Upon a motion for a preliminary injunction, the Court found that Empire knew the value of the employees and knew that the employees, like most employees in their industry, probably had a non-compete covenant. 844 F.Supp. at 382. After the employees solicited the Plaintiff's customers on behalf of Empire, the Plaintiff brought suit. The Court found that it was likely that the Plaintiff would succeed on the merits of its claim for breach of contract and misappropriation of confidential information and unfair competition. *Id.* at 388–91.

In *Jotan,* two managerial employees who were subject to valid non-compete, nondisclosure agreements left the debtor to work for its competitor, ESP. 229 B.R. at 219–20. The Debtor sued the former employees and ESP and sought to enjoin the Defendants from further violations of the agreements. The Court found that ESP had reason to know about the employees' agreements with the debtor, but

"was willing to roll the dice." *Id.* at 222. The Court concluded that it was likely that the debtor would succeed on the merits of its claim against the employees and ESP and therefore granted the debtor's motion for a preliminary injunction.

■ Blount raises as a defense that (being a Tennessee state hospital) it is immunized from suit under the Tennessee Governmental Tort Liability Act (TGTLA) for tortious actions such as interference with a contractual relationship. *See* Tenn. Code Ann. §§ 29–20–101 *et seq.* We conclude that the TGTLA does not immunize Blount from a suit for injunctive relief.

In *Jones v. Louisville and Nashville R.R. Co., Inc.,* the Plaintiffs sued a governmental entity for monetary and injunctive relief after the Defendant allegedly caused flooding which damaged the Plaintiff's homes. No. 85–134–II, 1986 WL 3435, at *1 (Tenn.Ct.App. March 21, 1986). After the Defendant raised the TGTLA as an affirmative defense, the Court held that, while the TGTLA immunized a governmental entity from a suit for monetary relief, it did not immunize the government from a suit seeking injunctive relief. *Id.* at *3. The *Jones* Court's holding is consistent with other Tennessee cases. *See, e.g., Paduch v. City of Johnson City,* 896 S.W.2d 767, 772 (Tenn.1995) ("an action for damages resulting from the creation or maintenance of a temporary nuisance by a governmental agency may be allowed under the act"); *Jenkins v. Loudon County,* 736 S.W.2d 603, 605 (Tenn.1987) ("The jurisdiction of a court of equity to abate a nuisance created and maintained by a municipality is not affected by the [T]GTLA"). Therefore, we conclude that the TGTLA is not a defense to the Debtors' request for injunctive relief.

The Debtors have established that they are likely to prevail on the merits in their action against Blount for tortious interference with the Debtors' business relations.[6]

### 3. *The Employees*

The Employees distinguish themselves from Blount and Fox by asserting that they are at-will, non-management employees. Additionally, they assert that only two of their actions are relevant to this case: 1) their resignation from the Debtors and acceptance of employment with Blount, and 2) their participation in soliciting the Debtors' customers on behalf of Blount.

■ The Employees assert that they did nothing wrong by resigning en masse. They assert that Fox advised them that Blount was entering the DME market and that Blount would offer each of the employees a job, giving them information regarding Blount's benefit package. They assert that they all separately decided to apply to Blount because Blount offered better benefits and greater job security. The Employees assert that, as at-will employees, the Thirteenth Amendment permits them to resign at any time. We agree. Thus we conclude that the Debtors would not be likely to succeed in enjoining the Employees from resigning.

■ We agree with the Employees' contention that Fox was the central organizer and is more culpable than the Employees. However, there is evidence that the Employees participated in soliciting the Debtors' customers on behalf of Blount. Like Fox, the Employees had an obligation not to compete with the Debtors while they were still employed at Home Medical.

We find misplaced the Employees' suggestion that they are not liable for interference with the Debtors' business relations with its customers merely because they were acting on the orders of Fox. We also disagree with the Employees' assertion they are not liable for breach of their duty of loyalty to their employer.

The Court of Appeals for the Third Circuit has articulated two basic principles

---

**6.** We make no findings as to any other cause of action against Blount as they are not necessary to our conclusion to grant a preliminary injunction against Blount.

underlying the employer-employee relationship:

> Any employee after leaving the service of an employer may carry on the same business on his own and use for his own benefits the things he has learned while in the earlier employment. If this were not so an apprentice who has worked up through the stages of journeyman and master workman could never become an entrepreneur on his own behalf. Any such system of quasi-serfdom has long since passed away. Necessarily the former employee may use what he learned in the former employer's business while engaged in business for himself or some business competing with the former employer.
>
> Equally clear is the proposition that the employee owes a duty of loyalty to the employer. He must not, while employed, act contrary to the employer's interests and, in general terms, owes a duty of loyalty as one of the incidents of the employer-employee relationship.

*Midland–Ross Corp. v. Yokana,* 293 F.2d 411, 412 (3d Cir.1961) (citations omitted). This latter tenet is also applicable under Tennessee law. *See Knott's Wholesale Foods v. Azbell,* No. 93–19, 1996 WL 697943, at *3 (Tenn.Ct.App. Dec. 6, 1996) where the Court stated: "During the employment relationship, an employee has a fiduciary duty of loyalty to the employer. The employee must act solely for the benefit of the employer in matters within the scope of his employment [and] must not engage in conduct that is adverse to the employer's interests."

The Debtors presented evidence that the Employees violated their duty of loyalty by soliciting the Debtors' customers for Blount while still in the Debtors' employ. We conclude that the Debtors have made a sufficient showing that they are likely to succeed in establishing that the Employees violated their duty of loyalty.

Despite their transgressions, we are cognizant of the Employees' need for employment. The Debtors have agreed to continue to employ the Employees in the interim. To the extent that the Employees still wish to resign from the Debtors, we will enjoin those Employees, other than Sue McMurray, from working for Blount. Because Ms. McMurray also signed a covenant not to compete, we hold that if Ms. McMurray resigns she cannot work for Blount or any other business which competes with the Debtors to the extent provided in her non-compete agreement.

### B. *The Extent of Irreparable Harm to the Debtors*

Permitting the Defendants to continue their actions would wreak absolute havoc on Home Medical. Were this Court to deny the Debtors' injunction pending a decision on the merits of the underlying matter, there is little, if any, chance that Home Medical will be open by the time trial commences. While the closure of one relatively small site will not sink the Debtors' reorganization, permitting the Debtors' competitor to continue its predatory actions would open the door to death from a thousand small bites.

Specifically, permitting the Employees to continue working for Blount after soliciting the Debtors' customers on Blount's behalf would have an irreparable deleterious effect on the Home Medical business.

### C. *The Extent of Irreparable Harm to the Defendants*

Fox asserts that he has no intention of appropriating or diverting the Debtors' property for the use or benefit of Blount. Further, Fox testified that he does not intend to work for Blount or any other competitor, but rather will do consulting only. Consequently, Fox will suffer no harm by the proposed injunction. Furthermore, any harm to Fox is clearly outweighed by the severe effect which would be felt by the Debtors if the injunction is not granted.

We find that enjoining Blount from hiring any of the Debtors' employees or soli-

citing the Debtors' customers would not result in irreparable harm to it. Blount has not yet opened its doors for business, so an injunction would not cause it to cease ongoing business. Compelling Blount to hire employees other than the Debtors' is not an irreparable harm as it did not present any evidence that these are the only persons in the area qualified for those positions. Nor did Blount establish that the positions require unique training or qualifications.

The only harm which Blount will suffer is that the Debtors' customers will not feel compelled to leave Home Medical to follow the Employees. Blount asserts, however, that it should be free to solicit the Debtors' customers, as patients are free to select their DME provider. However, as noted above, the customer list is protected property of the Debtors and Blount is not free to use that information. Further, to permit Blount to hire the Debtors' former employees, knowing that the Debtors' customers are likely to go to Blount, would only serve as a windfall to Blount for its complicity in Fox's wrongful actions.

However, by issuing an injunction against soliciting the Debtors' employees or customers, we are not precluding Blount from entering the DME business or from providing DME services to new customers (rather than referring them to the Debtors as is Blount's current practice). Thus, Blount is free to compete with the Debtors, without the unfair advantage it sought through its scheme with Fox.

In considering the harm to the Employees, we take note of the fact that the Employees are rank-and-file workers who have to be able to put food on their families tables. The proposed injunction would not estop the Employees from working. It would only estop the Employees from working for Blount, in direct competition with the Debtors.

*D. The Public Interest*

In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests. *American Film Tech., Inc. v. Taritero (In re American Film Tech., Inc.)*, 175 B.R. 847, 849 (Bankr.D.Del. 1994); *Gathering Restaurant, Inc. v. First Nat'l Bank of Valparaiso (In re Gathering Restaurant, Inc.)*, 79 B.R. 992, 999 (Bankr. N.D.Ind.1986). The Debtors' Maryville site, by itself, is not crucial to the Debtors' successful reorganization, but permitting the Defendants to continue their egregious, predatory conduct could serve as an incentive to other competitors to take similar actions.

There is also a second public interest which is implicated in this case: Tennessee's "strong public policy in favor of upholding contracts." *AmeriGas*, 844 F.Supp. at 390. Specifically, Tennessee has a strong interest in enforcing the sanctity of post-employment agreements because they preserve stability and certainty in business relations. *Id.*

Accordingly, we find that there is strong public interest to support granting a preliminary injunction in this case.

## IV. *CONCLUSION*

For the foregoing reasons, we grant the Debtor's motion against Joseph Fox, in its entirety. We also grant the Debtors' motion against Blount, in part, enjoining it from employing any of the Debtors' former or current employees or soliciting the Debtors' former or current customers. We grant the Debtors' motion against the Employees, in part, enjoining them from working for Blount and directing them to turn over any of the Debtors' property in their possession.

## *OPINION* [1]

Presently before the Court are motions to reconsider our November 9, 2000, Deci-

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

sion and Order (the "Decision" and "Order") filed by Defendants Donald Talley, Stephanie Redwine, Jill Fox, Matthew Jenkins, and Sue McMurray (collectively, "the Defendant Employees") and a motion to amend or clarify our Decision and Order by Defendant Blount Memorial Hospital ("Blount").

## I. FACTS

The background facts are detailed in our Decision. In our Order, we enjoined Blount from employing any of the former or current employees of one of the Debtors, East Tennessee Infusion and Respiratory, Inc., d/b/a Fox Home Medical ("Fox"), or soliciting any of Fox's former or current customers. We also directed the Defendant Employees to turn over any of Fox's property which is in their possession.

## II. DISCUSSION

█ A motion for reconsideration under Federal Rule of Bankruptcy Procedure 9023 is an extraordinary means of relief in which the movant must do more than simply reargue the facts or law of the case. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (a motion to reconsider must rely on one of three major grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error [of law] or prevent manifest injustice") (*quoting Natural Resources Defense Council v. United States Envtl. Protection Agency*, 705 F.Supp. 698, 702 (D.D.C.1989)); *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 908 (3d Cir.1985) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence"); *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385, 417 (D.Del.1999) ("[motions for reargument] should be granted sparingly and should not be used to rehash arguments already briefed or allow a 'never-ending' polemic between the litigants and the Court").

### A. Blount's Motion to Amend or Clarify

Blount's motion is premised, in part, upon our conclusion in the Decision that the Debtors are likely to succeed in establishing that Blount tortiously interfered with the Debtors' business relations. To the extent that Blount seeks to reassert its prior position regarding our evidentiary findings or legal conclusions, we conclude that we have not made a "clear" or "manifest" error and therefore Blount has failed to meet the standards required for reconsideration or reargument.

█ Because we found it likely that the Debtors would succeed on the merits of their claim, we granted a preliminary injunction prohibiting Blount from hiring any of Fox's current or former employees or soliciting any of the former or current customers of Fox pending a final determination of the merits of the adversary. In its motion to amend or clarify, Blount asserts that the injunction was not narrowly tailored to the harm which we concluded was caused by Blount. *See Davis v. Romney*, 490 F.2d 1360, 1370 (3d Cir.1974) ("Injunctions . . . must be tailored to remedy the specific harms shown"); *Old Charter Distillery Co. v. Continental Distilling Corp.*, 174 F.Supp. 312, 331 n. 127 (D.Del. 1959) ("Injunctions . . . should be no broader than is necessary to give adequate protection to the plaintiff").

Blount raises a number of issues for clarification:

(1) Whether Blount should be enjoined from contacting or soliciting a current hospital patient who was not a customer of Fox when this adversary proceeding was filed but is now a customer of Fox;

(2) Whether Blount should be enjoined from contacting or soliciting a current hospital patient who was not a customer of Fox at the commencement of this adversary proceeding but is a Fox customer now and also has need of non-oxygen services (which the Debtors do not provide);

(3) Whether Blount should be enjoined from contacting or soliciting a Fox customer (as of the date of the adversary proceeding) who was not a hospital patient at the commencement of the adversary proceeding, but now is a hospital patient who has need of non-oxygen DME services; and

(4) Whether Blount should be enjoined from contacting or soliciting a patient for home health care services where that patient was a Fox customer at the time the adversary proceeding was commenced but where Fox was not rendering home health care services to that patient.

We agree with Blount that the language in the original Decision and Order extends too far because it exceeds the relief needed to remedy the harm caused by Blount's interference with the business of Fox. In the Decision, we concluded that an injunction was necessary to shield Fox from the possible harm caused by Blount's actions. We did not intend it to be wielded as a sword to give Fox a competitive advantage.

Specifically, we found that Blount had improperly received Fox's customer list, as well as financial and other business information about Fox. We therefore concluded that an injunction was necessary to prevent Blount from using that information. However, we did not intend to prevent Blount from competing with Fox through legitimate means. That is, we did not intend to prohibit Blount from competing with the Debtors for future customers, so long as Blount did not use information improperly obtained. Prohibiting Blount from soliciting anyone who was a customer of Fox as of the filing of the adversary proceeding permits competition but denies Blount any advantage from its improper actions.

Blount also asks for clarification of the types of services to which the injunction applies: that is, if a patient was receiving one service from Fox pre-petition, may Blount solicit that customer for a different service. Because Blount's conduct has given it an unfair advantage (by identifying potential customers for home health services), we conclude that Blount should not be permitted to solicit any person who was a customer of Fox prior to the date of the commencement of this adversary proceeding for the same service or any service which Fox offers. We will clarify the Decision and Order accordingly.

B. *The Motions for Reconsideration of Ms. Redwine, Mr. Jenkins, and Mr. Talley*

In their respective motions, Ms. Redwine, Mr. Jenkins and Mr. Talley assert that there was evidence that other employees breached their duty to the Debtors by, *inter alia,* witnessing the transfer consent forms. However, they assert that there was no evidence presented that they had any improper contact with any Fox customers or that they committed any acts which would give rise to an allegation of breach of duty of their loyalty.[2]

We agree that the record does not contain any evidence which specifically demonstrates that Ms. Redwine, Mr. Jenkins, or Mr. Talley breached their fiduciary duty. Our original decision was not premised on such a finding, however. It was based on our preliminary finding that Blount had interfered with Fox's contracts with its customers and employees.

Consequently, we only enjoined the Defendant Employees from leaving the Debtors' employ and going to work for Blount.[3] The Defendant Employees are not prohibited from being employed by anyone else in any industry, including the DME industry. They may work for any employer who is willing and able to hire them.

---

2. Talley also asserts he retired from Fox and does not seek to be employed by Blount. The Debtors have agreed to dismiss him from the adversary, although no stipulation has been filed yet.

3. We also required the employees to turn over any property of the Debtors which is in their possession, pursuant to section 542 of the Code.

Blount, however, has been prohibited from hiring any of the former employees of Fox because of its improper action.

Even if we had not enjoined the Defendant Employees from working for Blount, the effect of our Order would be the same since Blount is enjoined from hiring them. Therefore, the motions for reconsideration of Ms. Redwine, Mr. Jenkins, and Mr. Talley are denied.

### C. *Ms. Fox's Motion for Reconsideration*

We noted on page 10 of the Decision that the Debtors and Ms. Fox had agreed that Ms. Fox could be employed by Blount so long as she did not work in the DME business. We inadvertently omitted that provision from the Order. Therefore, we grant the Motion of Ms. Fox for Reconsideration and will modify our Order accordingly.

### D. *Ms. McMurray's Motion for Reconsideration*

Ms. McMurray had a non-compete agreement with Fox. Consequently, in our Decision and Order, we enjoined her from going to work for any competitor of Fox. However, that agreement expired by its terms on July 31, 2000. We did not intend to extend the term of that agreement but only to enforce it. Therefore, we will modify our Order to delete any prohibition against Ms. McMurray working for any other company which competes with Fox, except Blount.

### III. *CONCLUSION*

For the foregoing reasons, we reaffirm, in part, and clarify, in part, our November 9, 2000, Decision and Order.

### *ORDER*

AND NOW, this **5TH** day of **JANUARY**, 2001, upon consideration of the Motions for Reconsideration of Jill Fox, Matthew Jenkins, Donald Talley, Stephanie Redwine, and Sue McMurray, and the Motion to Amend or Clarify of Blount Memorial Hospital, it is hereby

**ORDERED** that the Motion to Amend or Clarify of Blount Memorial Hospital is **GRANTED**, in part, as follows: Blount is enjoined from directly contacting or soliciting anyone who was a customer of Fox prior to the date of the filing of this adversary proceeding for any service which Fox was providing (or could have provided); and it is further

**ORDERED** that the Motion for Reconsideration of Ms. Redwine, Mr. Jenkins, and Mr. Talley is **DENIED**; and it is further

**ORDERED** that the Motion for Reconsideration of Ms. Fox is **GRANTED** to permit Blount to employ Ms. Fox so long as she does not work in the DME business; and it is further

**ORDERED** that the Motion for Reconsideration of Ms. McMurray is **GRANTED** and our Order is modified to delete any prohibition against Ms. McMurray working for any other company which competes with Fox, except Blount.